[No. 52151-9-I. Division One. May 3, 2004.]

*In the Matter of the Parentage of* L.B.

SUE ELLEN CARVIN, *Appellant*, v. PAGE BRITAIN, *Respondent.*

*Janet M. Helson* (of *Columbia Legal Services*); and Patricia *S. Novotny*, for appellant.

*Gayle A. Murray Brenchley*, for respondent.

*Leslie Cooper* and *H. Michael Fields* on behalf of American Academy of Matrimonial Lawyers, amicus curiae.

*Jamie D. Pedersen, Laura K. Clinton, Shannon Minter*, and *Courtney Joslin* on behalf of National Center for Lesbian Rights, amicus curiae.

*Aaron H. Caplan* on behalf of American Civil Liberties Union of Washington, amicus curiae.

*Katherine H. Federle, Angela Lloyd,* and *Raegen N. Rasnic* on behalf of Justice for Children Project, amicus curiae.

KENNEDY, J. — Sue Ellen Carvin brought this action against Page Britain, the biological mother of L.B., seeking to establish Carvin's coparentage of L.B., who was conceived by artificial insemination during the women's 12-year intimate domestic relationship. Carvin seeks to establish her coparentage under the Uniform Parentage Act (chapter 26.26 RCW), which, she contends, must be liberally construed to permit her claim in order to be constitutional. Alternatively, Carvin seeks status as a de facto or psychological parent under the common law of Washington. As an additional alternative, she seeks visitation rights with L.B. under Washington's third-party visitation statute, RCW 26.10.160(3). Carvin also seeks to have a guardian ad litem appointed for L.B.

After Carvin filed her complaint, Britain married the sperm donor, a gay friend of the parties named John Auseth. Following the marriage, Auseth signed an acknowledgement of paternity, and the child's birth certificate was amended to name him as the child's biological father. Britain contests Carvin's legal right to bring the action, and also contends that John Auseth is a necessary party to the action under CR 19.

The trial court ruled that Carvin has no cause of action and dismissed her petition. Accordingly, the court found it unnecessary to rule on the questions of whether John Auseth is a necessary party and whether a guardian ad litem ought to be appointed for L.B. Carvin appeals.

We agree with the trial court that under the plain language of the Uniform Parentage Act as amended in 2002, Carvin has no cause of action. We decline to address Carvin's constitutional claims because we conclude (1) that she has stated an action for recognition as a de facto or psychological parent under the common law of Washington, and (2) that the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) does not, on the facts of this case, bar her action for third party visitation. Accordingly, we reverse in part and remand for such further proceedings as shall be consistent with this opinion. Because we hold that L.B. is a necessary party to a common-law action to determine her parentage, we specifically direct that following our remand, the trial court shall promptly appoint a guardian ad litem for L.B. and that the guardian ad litem be served with and answer Carvin's petition. We refer Britain's contention that the sperm donor, John Auseth, became a necessary party to the action when she married him and placed his name on the child's birth certificate as the biological father, back to the trial court which has not yet ruled on the motion. We decline to grant Britain's request that we direct the trial court to adjudicate that John Auseth is L.B.'s legal father. Auseth has not sought to intervene in the lawsuit, and accordingly has not requested any affirmative relief in the action. Moreover, Britain's request for affirmative relief on his behalf is raised for the first time on appeal. And finally, should he hereafter be joined as a party, either permissively or as an indispensable party, there are questions of both fact and law that will need to be addressed before his legal status can properly be adjudicated.

## FACTS

Sue Ellen Carvin and Page Britain became romantically involved in 1989, and that same year began living together in an intimate domestic relationship. The two were still together when Britain conceived L.B. in 1994, by means of artificial insemination performed by Carvin, who used a

syringe containing sperm donated by a gay male friend, John Auseth. When he agreed to act as the sperm donor, Auseth moved in with Carvin and Britain. The three of them went to counseling and discussed whether, if Britain were to become pregnant, Auseth should play any ongoing role in the life of the child. Although Carvin and Britain dispute the circumstances, Auseth left soon after L.B. was conceived, moving to California. He had no further contact with the parties and played no role in the support and rearing of L.B. until after Britain and Carvin separated.

During Britain's pregnancy, Carvin and Britain both attended prenatal appointments, child-birthing classes, and counseling sessions, in anticipation of the birth. Carvin sent out pregnancy announcements to friends. Britain and Carvin were given joint baby showers. L.B. was born on May 10, 1995. Carvin was present during the birth and was the first to hold L.B. after she was delivered.

Although Britain disputes that she and Carvin planned the pregnancy together, she admits that Carvin accompanied her to the hospital to receive the pregnancy results, and that Britain informed her labor assistant that Carvin would be "part of the birthing process." L.B.'s baby book shows that Britain changed the "father" entries to "mother" and wrote information about Carvin in their place. Britain and Carvin chose to give L.B. a name that honored each of their families.

Britain disputes that she ever considered Carvin to be her "partner." However, her declaration illustrates that she and Carvin continued their domestic relationship after L.B.'s birth and that they ran their household together. They "brainstormed" together about how to improve their financial situation. They also discussed parenting issues, such as how much or how little to discipline L.B., and whether the child would be allowed to sleep in their bed. Britain admits in her declaration that Carvin transported L.B. to and from her daycare so that Britain could be at work early, and that Carvin contributed financially at some

level to L.B.'s daycare and school expenses. Britain was, at one time, open to Carvin adopting the child.

Although Britain also disputes, notwithstanding her entries into L.B.'s baby book, that she ever considered Carvin to be L.B.'s "mother," the record reflects that Carvin provided much of the child's "mothering" during the first six years of her life. Carvin produced numerous declarations from friends and family of both Carvin and Britain, as well as school officials. The declarations reflect that Carvin was L.B.'s primary caretaker during her infancy and preschool years, and that Carvin was the primary parent to deliver L.B. to and from daycare, school, sports practices and games, and that she attended L.B.'s school events. It is undisputed that when she learned to talk, L.B. referred to Carvin as "Mama" and to Britain as "Mommy." Moreover, Carvin was listed as L.B.'s "mother" on school registration forms. Carvin's declarants state that Carvin was a good mother to L.B., that Britain and Carvin held themselves out as coparents, and that Britain and Carvin were a stable couple for 12 years. Two close friends declare that, prior to the pregnancy, Carvin and Britain openly discussed with their friends their plans to have a child together.

Britain states that she became frustrated with Carvin's inability to keep a job, the couple's financial insecurity, and her belief that Carvin expected her to pay for everything while she, Carvin, "enjoyed the glory of being a 'mom.'" Britain says that sometime in 1999, she finally agreed to Carvin's request for Carvin to stay at home full time, out of sheer exhaustion and duress. She also states that she was unhappy in her relationship with Carvin during the late 1990s. Some two years later, in 2001, Britain decided to separate permanently from Carvin.

Following the separation, Britain initially agreed that she and Carvin would share the parenting of L.B. Britain would drop L.B. off at Carvin's house early in the morning, so that she could get to work on time. Britain states that she came to believe that these visitations were disruptive to L.B.'s stability. She declares that Carvin did not keep to a

regular bedtime and dinner schedule, and often delivered L.B. to school tardily or not at all. Britain also states that L.B. had morning vomiting before being delivered to Carvin, that she experienced anxiety and tantrums, and that she wet the bed. And she asserts that Carvin continued to be financially irresponsible and that she contributed little to L.B.'s education and daycare expenses, contrary to the parties' agreements. Britain unilaterally began to limit Carvin's contact with L.B.

Carvin asserts that even though she had unstable employment during this time, she continued to make financial contributions to L.B.'s care. Carvin submitted an e-mail from Britain that was written during this period, stating that Britain did not intend ever to permanently separate Carvin and L.B., and that Carvin was the child's "2nd mom," and "the best mother."

In September 2001, Britain contacted Auseth and introduced him to L.B. as her father. After several disputes with Carvin about how she supervised L.B., Britain and Auseth confronted Carvin, telling her that she could have no contact with L.B. for a period of six months. Many of the declarations from friends, family, and school officials reflect that L.B. was very upset and hurt by her separation from Carvin. Nevertheless, at the end of the six months, Britain unilaterally decided to permanently end all contact between Carvin and L.B. Auseth then moved in with Britain and L.B.

After several months of total separation from L.B., Carvin petitioned for a determination of parentage under chapter 26.26 RCW, Washington's version of the Uniform Parentage Act, and alternatively under a common-law theory of de facto parentage. As a third alternative, Carvin requested third party visitation under RCW 26.10.160(3).

Soon after Carvin filed her petition, Britain married Auseth. Auseth then signed an acknowledgement of paternity, and Britain changed L.B.'s birth certificate, school records, and medical records to state that Auseth is L.B.'s father. Auseth submitted a declaration stating that Carvin

was the primary reason that he left the Seattle area prior to L.B.'s birth, and the primary reason that he did not stay in contact with the child. He stated that he had recently left his job as a school vice-principal in California and moved to Seattle, so that he could pursue the opportunity to be a father to L.B. Britain submitted declarations from friends and family stating that they believed that Carvin's influence on L.B. had been harmful. Britain also submitted a declaration from L.B.'s therapist stating that although the child initially had problems with her separation from Carvin, L.B. currently is "well-adjusted and happy."

A court commissioner denied Carvin's request for temporary parenting or visitation orders and for appointment of a guardian ad litem for L.B., concluding that Carvin lacked standing to petition for parentage or visitation. Carvin moved for revision of the commissioner's ruling.

The trial court observed that a substantial relationship existed between Carvin and L.B. and that there was a "substantial showing in the record that terminating visitation between the Petitioner and the child harmed the child . . . ." Clerk's Papers at 311-12. However, the court ruled that chapter 26.26 RCW provides Carvin with no cause of action and does not violate equal protection or Washington's Equal Rights Amendment by denying Carvin the right to petition for a determination of parentage. The court also ruled that no common-law action for de facto parentage exists in Washington. Finally, the court concluded that any third-party visitation rights pursuant to RCW 26.10.160(3) that might still remain after *Troxel*, 530 U.S. 57, require a showing that the objecting parent is unfit. Thus, the court "reluctantly" agreed with Britain that Carvin has no cause of action for the determination of coparentage or third party visitation, and affirmed the court commissioner's ruling. The court also concluded that since it was dismissing Carvin's action, it did not need to determine whether Auseth is a necessary party in the

action, and it did not need to appoint a guardian ad litem for L.B.

This appeal followed.

## DISCUSSION

The primary issue on appeal is whether Carvin has standing under statutory or common law to petition either for a determination of coparentage or for visitation with L.B. Standing is a question of law, and thus subject to de novo review. *In re Guardianship of Karan*, 110 Wn. App. 76, 81, 38 P.3d 396 (2002) (citing *Trask v. Butler*, 123 Wn.2d 835, 842-43, 872 P.2d 1080 (1994)). Statutory interpretation is also reviewed de novo. *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002) (citing *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001), *cert. denied*, 534 U.S. 1130 (2002)). As the petitioner, Carvin bears the burden of establishing standing. *Allan v. Univ. of Wash.*, 92 Wn. App. 31, 35, 959 P.2d 1184 (1998), *aff'd*, 140 Wn.2d 323, 997 P.2d 360 (2000).

Although some of the facts are disputed, we view them in the light most favorable to Carvin, in order to address the causes of action in this case.

### I. Uniform Parentage Act

Carvin first argues that the Washington Uniform Parentage Act (UPA), chapter 26.26 RCW, provides a method for determining her coparentage of L.B. Carvin asserts that the current UPA, adopted in 2002, embodies a flexible approach to defining family, one that is not limited by marital status, sex, or biology, and that its terms encompass her parentage claims. Amicus for the National Center for Lesbian Rights supports Carvin's arguments and additionally argues that the previous UPA applies to Carvin's claims, in that L.B. was born before the repeal of the former act and the adoption of the current act.

The definition of "parent" under the previous UPA was never construed to include a same-sex partner of a biological parent. However, before the repeal of the former act and the adoption of the 2002 act, this court indicated that such theoretically might be possible, under an equal protection analysis. *See State ex rel. D.R.M.*, 109 Wn. App. 182, 189-91,

34 P.3d 887 (2001) (neither party having assigned error to the trial court's ruling that the former UPA did not apply to the case, the appellate court did not review that ruling, but reviewed whether the former act, as applied by the trial court, violated the equal protection rights of the child or either party; the court first assumed that RCW 26.27.170 allowed former RCW 26.26.040(1)(d) and (e) to apply to a lesbian couple to determine if the mother-child relationship existed with both adults, but then concluded that because under the facts of that case a male would not have been able to establish presumptive paternity under former RCW 26-.26.040(1)(d) or (e) there was no violation of equal protection).

■ ■ When the UPA was amended in 2002, RCW 26 .26.040 was repealed, and equivalent sections regarding presumptive parentage were not included in the new act. But amicus for the National Center for Lesbian Rights argues that because L.B. was born in 1995, well before the repeal of the former act and the adoption of the current version, the former act applies here. Absent contrary legislative intent, statutes are presumed to operate prospectively. *Bayless v. Cmty. Coll. Dist., No. XIX*, 84 Wn. App. 309, 927 P.2d 254 (1996). The 2002 UPA provides that "[a] proceeding to adjudicate parentage which was commenced before June 13, 2002, is governed by the law in effect at the time the proceeding was commenced." RCW 26.26.904. This indicates a clear legislative intent that the 2002 UPA operates prospectively as to petitions for determination of parentage commenced after June 13, 2002. Carvin filed her petition on November 11, 2002. Thus, we conclude that Carvin's claims must be evaluated under the 2002 act.

Presumptions of paternity in the 2002 UPA focus on the marriage of the putative father and mother, whether before or after the birth of the child. RCW 26.26.116. A mother-child relationship is established, inter alia, by a woman giving birth to the child, by her adoption of the child, by her entry into a surrogate parentage contract where she is the intended parent, by the artificial insemination of the in-

tended mother who then gives birth to the child, or by an "adjudication of the woman's maternity." RCW 26.26.101(1). A father-child relationship is established, inter alia, by an unrebutted presumption of the man's paternity based on his marriage to the child's mother before or after the birth of the child, by the man signing an acknowledgment of paternity, by an adjudication of the man's paternity, by his adoption of the child, by the man having consented to assisted reproduction by his wife that resulted in the birth of the child, or by a surrogate parentage contract under which he is an intended parent of the child. RCW 26-.26.101(2). A husband may also be determined the father of a child conceived through artificial insemination of his wife even if he did not consent, if he thereafter openly treats the child as his own. RCW 26.26.715. *See also* RCW 26.26.720 (limitations on dispute as to paternity of a child of assisted reproduction).

Washington appellate courts have not heretofore been requested to consider whether the 2002 UPA provides a method for determining parentage of the same-sex domestic partner of a biological parent of a child conceived by artificial insemination. Carvin points out that the 2002 UPA provides that a mother-child relationship can be established through an "adjudication of the woman's maternity." RCW 26.26.101(1)(b). She also points out that the UPA states, "[t]he provisions relating to determination of paternity may be applied to a determination of maternity." RCW 26.26.051. The UPA further provides that "[a] child born to parents who are not married to each other has the same rights under the law as a child born to parents who are married to each other." RCW 26.26.106. Thus, Carvin argues, the UPA must be interpreted to provide her, an unmarried woman who participated in the artificial insemination of her domestic partner, with her partner's consent, an opportunity to adjudicate parentage in the same manner as a man, despite her inability to marry her partner. Carvin asserts that this result is mandated by the clear language of the UPA and Washington's Equal Rights Amendment, Wash. Const. art. XXXI, § 1.

■ But unambiguous statutes are not open to judicial interpretation. *Harmon v. Dep't of Soc. & Health Servs.*, 134 Wn.2d 523, 530, 951 P.2d 770 (1998). Statutes are ambiguous if their language is susceptible to more than one reasonable interpretation. *Harmon*, 134 Wn.2d at 530 (citing *Vashon Island Comm. for Self-Gov't v. Wash. State Boundary Review Bd.*, 127 Wn.2d 759, 771, 903 P.2d 953 (1995)). This court resorts to the rules of statutory interpretation when a statute is ambiguous and attempts to ascertain and give effect to the intent and purpose of the legislature. *Harmon*, 134 Wn.2d at 530 (citing *State v. Bash*, 130 Wn.2d 594, 601-02, 925 P.2d 978 (1996); *State v. Hennings*, 129 Wn.2d 512, 522, 919 P.2d 580 (1996)). In order to discern legislative intent, we may look to the legislative history of the statute as well as to other statutes dealing with the same subject matter. *Harmon*, 134 Wn.2d at 530 (citing *Wash. Pub. Util. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1*, 112 Wn.2d 1, 7, 771 P.2d 701 (1989)).

An individual has standing under the 2002 UPA to adjudicate parentage if that person is (1) the child; (2) the mother of the child; (3) a man whose paternity of the child is to be adjudicated; (4) the division of child support; (5) an authorized adoption agency or licensed child placing agency; (6) a representative authorized by law to act for a deceased, incapacitated, or minor individual; or (7) an intended parent under a surrogate parentage contract as defined in specific sections of the act (none of which apply to the case at bench). RCW 26.26.505. *See also* RCW 26.26.510 (identifying the parties required to be joined as: the mother of the child, the man whose paternity is to be adjudicated, and the intended parent in a surrogate parentage contract as provided in specific sections of the act (none of which apply to the case at bench)). Carvin does not fit into any of these unambiguous categories. Although L.B. was conceived by artificial insemination performed by Carvin with sperm donated by Auseth, Britain did not agree to be artificially inseminated under a surrogate parentage contract, which is expressly defined to be a contract or arrange-

ment to conceive a child through natural or artificial means and to voluntarily relinquish parental rights to the child in favor of the intended mother. *See* RCW 26.26.210(3) and (4). Although there is overwhelming evidence in this record that Carvin was an "intended parent" in the arrangement between her, Britain, and Auseth, that is, that Auseth served as a "surrogate father" as it were, for Carvin, these parties and their particular arrangement simply are not covered by the 2002 UPA. The act expressly defines surrogate mothers and surrogate parentage contracts in terms of the gender of the contracting parties.

It is true that the 2002 UPA provides that adjudication of the mother-child relationship may be treated the same as adjudication of the father-child relationship, and that children must be treated equally without consideration of the marital status of their parents. But UPA provisions allow for presumption of paternity only where the mother and father marry before or after the birth of the child, and allow for determination of the father-child relationship in an artificial insemination situation only if the mother and man are married at the time of the insemination. Thus, it is clear that the legislature made a policy decision when it enacted the 2002 UPA to limit the statutory determination of parentage in artificial insemination situations to individuals who are married.

■ The 2002 UPA broadly demarcates between unmarried and married couples with respect to both presumptions of parentage and assisted reproduction. Accordingly, while the previous UPA may have provided a cause of action for a same-sex unmarried individual to pursue parentage based on artificial insemination, *D.R.M.*, 109 Wn. App. at 189-91, we conclude that the current UPA clearly does not. Carvin was not married to Britain, nor could she marry Britain, during the time that L.B. was conceived or after, to the time of this writing. RCW 26.04.010(1); RCW 26.04.020(1)(c); *Singer v. Hara*, 11 Wn. App. 247, 522 P.2d 1187 (1974). Her inability to petition under the UPA is not based solely on her gender, but also on her status as an unmarried

individual and the failure of the 2002 UPA to address the situation in which a male donates sperm for purposes of artificial insemination as a surrogate for a woman who is part of a same-sex relationship. Thus, the trial court did not err in ruling that the 2002 UPA gives Carvin no right of action to establish her parentage of L.B.

██ ██ Whether the 2002 UPA, so construed, violates Washington's Equal Rights Amendment or federal equal protection is another question, and one that the parties and amicus have briefed extensively. But courts generally will not address the constitutionality of a statute where the case at bench can be resolved by other means. *City of Seattle v. Williams*, 128 Wn.2d 341, 347, 908 P.2d 359 (1995) (citing *State v. Speaks*, 119 Wn.2d 204, 207, 829 P.2d 1096 (1992)). Moreover, in construing an otherwise unconstitutional statute in such a manner as to render it constitutional, courts are not free to rewrite the statute as if there were no such thing as the constitutional doctrine of separation of powers. *See, e.g., Carrick v. Locke*, 125 Wn.2d 129, 882 P.2d 173 (1994). *Cf. State v. Halstien*, 122 Wn.2d 109, 857 P.2d 270 (1993); *City of Seattle v. Ivan*, 71 Wn. App. 145, 856 P.2d 1116 (1993).

 We think it highly unlikely that our legislature is unaware that two women living in an intimate domestic relationship who desire to have a child can accomplish pregnancy through artificial insemination performed by one of the women upon the other, by use of a syringe filled with the sperm of a male donor. We do not believe that the legislature failed to address this situation by oversight; rather, we believe the omission to have been deliberate.[1] Even so, our legislature cannot have intended to leave

---

[1] Similarly, our legislature has declined thus far to legislate with respect to property rights arising out of meretricious relationships between heterosexual couples. In both these situations, the legislature has made what can only be a conscious decision to leave these matters for resolution under the common law, which is the province of the courts. We observe that Division Three of our court recently extended the property rights granted to heterosexual couples arising from meretricious relationships to same-sex couples who have lived in an intimate domestic relationship. *See Gormley v. Robertson*, 120 Wn. App. 31, 83 P.3d 1042 (2004).

parties to such parentage arrangements and the children born of such arrangements without any remedy whatsoever. We think, instead, that the legislature intended to leave such matters to the common law, which is the province of the courts.[2] Accordingly, we turn to the common law of Washington, without addressing Carvin's constitutional claims with respect to the 2002 UPA.

## II. De Facto Parentage

The trial court concluded that "common-law actions available in the parent-child area are very limited" and ultimately ruled that no common-law claim for de facto parentage exists in Washington. Carvin asserts that the trial court erred, and argues that a common-law claim of de facto parentage provides the courts with a method for determining Carvin's parentage of L.B. Amicus for the Lesbian & Gay Rights Project of the American Civil Liberties Union (ACLU) supports Carvin's position.

Common law is a creation of the courts rather than of legislatures. As the Washington Supreme Court commented in *Lundgren v. Whitney's, Inc.*, " 'in the common law system the primary instruments of this evolution [of the law] are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them.' " 94 Wn.2d 91, 95, 614 P.2d 1272 (1980) (court commenting in response to argument that abrogation of the tort claim of loss of consortium should be left to the legislature) (quoting *Rodriguez v. Bethlehem Steel Corp.*, 12 Cal. 3d 382, 393-94, 525 P.2d 669, 115 Cal. Rptr. 765 (1974)). *Lundgren* recog-

---

[2] A common-law remedy survives the enactment of a statutory remedy if the legislature has not expressed an intention to preempt the common-law remedy and the common-law remedy fills a void in the law for redress of an act or omission that contravenes a clear mandate of public policy. A mandate of public policy usually is expressed in a constitutional, statutory, or regulatory provision or scheme, or in a prior judicial decision. *Roberts v. Dudley*, 92 Wn. App. 652, 655, 966 P.2d 377 (1998), *aff'd*, 140 Wn.2d 58, 993 P.2d 901 (2000). Washington's Equal Rights Amendment, Const. art. XXXI, is a clear mandate of public policy declaring that equality of rights and responsibility under the law shall not be denied or abridged on account of sex. Moreover, as we shall discuss, *infra*, Washington courts have long recognized de facto parentage, notwithstanding that RCW 26.26.021 and its predecessors state that chapter 26.26 RCW governs every determination of parentage in this state.

nized that in many instances the court has acted to "reassess the common law and alter it where justice requires." *Lundgren*, 94 Wn.2d at 95 (citing *Grimsby v. Samson*, 85 Wn.2d 52, 59-60, 530 P.2d 291 (1975)) (adopting for the first time in Washington the *Restatement (Second) of Torts* § 46 (1965) on the tort of outrage); *Borst v. Borst*, 41 Wn.2d 642, 657, 251 P.2d 149 (1952) (limiting the doctrine of parent-child immunity); *Freehe v. Freehe*, 81 Wn.2d 183, 189, 500 P.2d 771 (1972) (abolishing the old rule of interspousal tort immunity and commenting on the court's right to do so).

In the area of domestic relations and parentage, our Supreme Court stated in *State v. Douty*, 92 Wn.2d 930, 934-35, 603 P.2d 373 (1979) that it seems clear, under the authority of *Gomez v. Perez*, 409 U.S. 535, 93 S. Ct. 872, 35 L. Ed. 2d 56 (1973) that parentage "may be determined in a suit on behalf of a child born out of wedlock regardless of an authorizing state statute. *See Kaur v. Chawla*, 11 Wn. App. 362, 522 P.2d 1198 (1974). Cases from this court, at least in dicta, indicate a similar view [citing] *State v. Bowen*, [80 Wn.2d 808,] 811, [498 P.2d 877 (1972)]; *State v. Wood*, 89 Wn.2d 97, 100, 569 P.2d 1148 (1977)."

In *Kaur v. Chawla*, the court recognized that at some point between our Washington Supreme Court's ruling denying an illegitimate child a common-law right to bring an action for support from its putative father in *State v. Tieman*, 32 Wash. 294, 73 P. 375 (1903) and the same court's statement in *Heney v. Heney*, 24 Wn.2d 445, 459, 165 P.2d 864 (1946) that there should be no discrimination when it comes to the State's interest in seeing that provision is made for the support, education and training of minor children, between children born out of wedlock and children legitimately born, the common law of this state changed. *Kaur*, 11 Wn. App. at 363. Accordingly, the *Kaur* court squarely held that Washington's filiation statute was not exclusive and that the mother of the child had a common-law right to bring a parentage action, even though the statute of limitations set down in the filiation statute had expired. *Id*. at 367-68. Similarly, in *Nettles v. Beckley*, 32

Wn. App. 606, 648 P.2d 508 (1982) Division Three of this court held that the parentage action could be brought regardless of the statutory paternity procedure because the statutory procedure was not exclusive, and the child had a common-law right of support from its parents. *Nettles*, 32 Wn. App. at 607-08.

Amicus for the ACLU emphasizes that the core of the family interests protected by the due process clause of the United States Constitution is the emotional bond that develops between family members as a result of shared daily life. *See Lehr v. Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983) (State's failure to give putative father notice of pending adoption proceedings did not deny putative father due process or equal protection where putative father had never established a substantial relationship with the child). The United States Supreme Court has also recognized that a family bond may exist even in the absence of blood relationships. *See Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 844-46, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (emotional bond between child and foster parents required that foster parents be afforded minimum due process rights before removal of children from foster home). Amicus for the ACLU argues that this bond, which also exists between children and their nonbiological parents, should be legally recognized.

Washington courts often have recognized that parent-child bonds form regardless of biology or statutes providing traditional parental rights. For instance, in *In re Dependency of Ramquist*, 52 Wn. App. 854, 765 P.2d 30 (1988) the court recognized that a foster child was "psychologically bonded" to his foster family, with whom he had lived virtually all his life, and affirmed the trial court's award of custody of a child to the foster family when the parents' rights were terminated. *Ramquist*, 52 Wn. App. at 862.

This psychological bond was also recognized in *McDaniels v. Carlson*, 108 Wn.2d 299, 738 P.2d 254 (1987), a paternity action brought by a man who had maintained a

sexual relationship with a married woman, who then conceived a child. Both the woman and her previous husband objected to the paternity action because the child was born during their marriage and had been found to be a child of their marriage during their dissolution action. *McDaniels*, 108 Wn.2d at 300-01. In remanding for a determination of paternity, the *McDaniels* court recognized that both the husband and the petitioner had established strong parenting relationships with the child, and that these relationships justified maintaining visitation between the child and both of the men even after paternity was established. *McDaniels*, 108 Wn.2d at 310, 313.

An even more pointed recognition of the importance of the psychological bond between a child and a nonbiological parent was expressed in *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981). In that case a stepmother had raised her deaf stepson as her own since he was three years old and had fully integrated the child into her family. She ensured that he learned sign language, that all her other children learned sign language as well, and that the whole family communicated with the child in sign language. *Allen*, 28 Wn. App. at 640-41. The *Allen* court recognized that a de facto parental relationship had formed between the stepmother and the child. Thus, the court affirmed the trial court's award of custody of the child to the stepmother following the dissolution of her marriage to the biological father, despite the absence of a finding that the biological father was unfit—because it would have been detrimental to the child's growth and development to place him with his biological parent. *Allen*, 28 Wn. App. at 647-48.

Similarly, in *In re Custody of Shields*, 120 Wn. App. 108, 84 P.3d 905 (2004), the appellate court affirmed the trial court's award of custody of a child to his stepmother following the death of the child's father, even though the child's mother was not unfit, because it was detrimental to the child to remove him from his de facto family where he had become well-integrated into the home of his stepmother, stepsister and half brother, prior to the death of his father.

Finally, other Washington family law cases have recognized the importance of the psychological bond between a child and a caretaker. *See, e.g., In re Dependency of J.H.*, 117 Wn.2d 460, 469, 815 P.2d 1380 (1991) (recognizing emotional bond between foster parents and child, although ultimately determining foster parents did not have rights of parents in dependency action under chapter 26.44 RCW); *In re Custody of Stell*, 56 Wn. App. 356, 369-71, 783 P.2d 615 (1989) (recognizing that aunt had become psychological parent of nephew and reversed and remanded for trial and a custody decision under chapter 26.10 RCW where the evidence indicated that the biological parent was unable to care for the child); *In re Welfare of Hansen*, 24 Wn. App. 27, 36, 599 P.2d 1304 (1979) (recognizing the due process rights of legal guardians, who had raised child for over eight years and stood in loco parentis to the child, to be given a full and meaningful opportunity to be heard at a dependency hearing under chapter 13.04 RCW), cited with approval in *In re Dependency of J.W.H.*, 147 Wn.2d 687, 700-01, 57 P.3d 266 (2002).

However, Britain asserts that she is a fit parent and that this court's recognition of a common-law claim of de facto parentage would violate her constitutional guaranties against unwarranted governmental intrusion into her parenting decisions. Britain argues that Washington courts, including many of the cases Carvin cites, have granted custody to a de facto or psychological parent only when the biological parent is unfit or provides an environment detrimental to the child's development. *See, e.g., Stell*, 56 Wn. App. at 369-71; *Allen*, 28 Wn. App. at 647-48; *Hansen*, 24 Wn. App. at 36. *See also Dependency of J.W.H.*, 147 Wn.2d 687 (aunt and husband were "custodians" pursuant to chapters 13.04 and 13.34 RCW and could intervene in dependency action where biological parents were alleged to be unfit); *In re Pawling*, 101 Wn.2d 392, 399-401, 679 P.2d 916 (1984) (allowing adoption by stepfather, as psychological parent, without consent of biological father only after biological father was found to have willfully

abandoned the child pursuant to RCW 26.32.056). Britain claims that Washington cases also illustrate that nonparents lack a protected interest in maintaining relationships with children who are not their own. *See, e.g, J.H.*, 117 Wn.2d at 468-70 (despite strong emotional bond, foster parents do not have same rights as parents in dependency action under chapters 13.04, 13.34, and 74.13 RCW).

However, Britain fails to recognize that many of these cases reflect the limitations set forth in statutes and are based on dependency, custody, or adoption actions where the biological parent is alleged to be deficient. Moreover, the *Allen* court held that the State may interfere with the natural parent's constitutional rights only if (1) the parent is unfit or (2) "the child's growth and development would be detrimentally affected by placement with an otherwise fit parent . . . ." *Allen*, 28 Wn. App. at 647. The *Stell* court later held that the legislature, in adopting chapter 26.10 RCW, intended to incorporate the *Allen* court's judicial interpretation of the earlier statute. *Stell*, 56 Wn. App. at 365; *Custody of Shields*, 120 Wn. App. at 122-23.

Carvin does not request a determination of coparentage because Britain is unfit, but rather because she alleges that she is a de facto parent with whom the child is psychologically bonded and that it would be detrimental to L.B.'s growth and development to deprive her of the de facto parenting relationship that was fostered with Britain's consent and active participation. Further, Carvin's claim of de facto parentage does not rest in statutory authority, but on a potential extension of common law.

No Washington case is exactly on point. This being a case of first impression, we may consider cases from other jurisdictions that have dealt with this issue. *See, e.g., In re Welfare of Colyer*, 99 Wn.2d 114, 119, 660 P.2d 738 (1983).

We first note *In re Custody of H.S.H-K.*, 193 Wis. 2d 649, 533 N.W.2d 419 (1995), in which the Wisconsin Supreme Court addressed whether a woman who had helped her same-sex partner to conceive and raise a child could peti-

tion for visitation after the couple separated. The court held that while the biological mother's former partner could not assert a statutory claim to visitation, a trial court has equitable authority to consider a petition for visitation when it determines that a petitioner has a parent-like relationship with child. *H.S.H.-K.*, 193 Wis. 2d at 658-59. Mindful of the need to balance parental rights of the natural parent against the best interests of the child, the court noted that a petition for visitation would not be entertained unless the petitioner proved the existence of a "parent-like relationship" with the child as well as a triggering factor, such as denial of all visitation with the child. *H.S.H.-K.*, 193 Wis. 2d at 658-59.

The court in *H.S.H.-K.* held that a parent-like relationship could be proved by evidence that (1) *the natural or legal parent consented to and fostered the parent-like relationship*; (2) the petitioner and the child lived together in the same household; (3) the petitioner assumed obligations of parenthood without expectation of financial compensation; and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature. *H.S.H.-K.*, 193 Wis. 2d at 658-59. The court held that the trial court's exercise of equitable power "protects parental autonomy and constitutional rights by requiring that the parent-like relationship develop only with the consent and assistance of the biological or adoptive parent. It also protects a child's best interest by preserving the child's relationship with an adult who has been like a parent." *H.S.H.-K.*, 193 Wis. 2d at 696.

Similarly, the case of *E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886 (1999), involved a lesbian couple who planned a pregnancy together, supported each other during the pregnancy and childbirth, and gave the child both of their last names. The parties raised the child as their own for several years, expressing publicly that the child had two mothers. *E.N.O.*, 429 Mass. at 825-26. The parties separated and the biological mother cut her partner off from all

access to the child. The nonbiological partner sued for specific performance of an agreement to adopt. *E.N.O.*, 429 Mass. at 826.

Again, although no statute expressly permitted the grant of visitation to a nonparent, the Massachusetts Supreme Court approved the trial court's grant of visitation to the nonbiological partner pending the outcome of the trial because the trial court had found she was a de facto parent and that visitation was in the best interests of the child. *E.N.O.*, 429 Mass. at 826-27. Similar to the court in *H.S.H.-K.*, the *E.N.O.* court defined a de facto parent as

> one who has no biological relation to the child, but has participated in the child's life as a member of the child's family . . . resides with the child and, *with the consent and encouragement of the legal parent*, performs a share of caretaking functions at least as great as the legal parent,

as long as the care was not provided primarily for compensation. *E.N.O.*, 429 Mass. at 829 (emphasis added) (citing *Youmans v. Ramos*, 429 Mass. 774, 776 & n.3, 711 N.E.2d 165 (1999)). The *E.N.O.* court emphasized that parental rights are not absolute and it balanced the natural parent's rights with the child's interest in maintaining her relationship with her parent. *E.N.O.*, 429 Mass. at 833.

In 2000, the New Jersey Supreme Court adopted a test similar to that established in *H.S.H.-K.* for determining whether the same-sex partner of a biological mother was also a psychological parent of children born through artificial insemination. *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539 (2000). Under facts analogous to those presented here, the court in *V.C.* first analyzed cases from several jurisdictions that recognized the concept of the "psychological parent." *V.C.*, 163 N.J. at 219-21 (citing cases from Alaska, Colorado, Kentucky, Utah, as well as *E.N.O.*, 429 Mass. 824, and *H.S.H.-K.*, 193 Wis. 2d 658). The court then held that psychological parents could petition for visitation if they could establish the same four factors set forth by the *H.S.H.-K.* court. *V.C.*, 163 N.J. at 223-24 (citing *H.S.H.-K.*, 193 Wis. 2d 658. The New Jersey Supreme Court com-

mented that because these factors illustrated *the legal parent's consent and support of the relationship between the psychological parent and the child*, recognition of the relationship does not intrude on the legal parent's basic liberty interests in raising a child as he or she sees fit. *V.C.*, 163 N.J. at 224-25.

More recently, the Pennsylvania Supreme Court in *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913 (2001) affirmed a trial court's determination that the lesbian partner of a biological mother had standing, "in loco parentis," to seek partial custody where the couple had jointly decided to conceive and parent a child. *T.B.*, 567 Pa. at 228. The Pennsylvania court commented that the term "in loco parentis" referred to persons who put themselves in the situation of a lawful parent by assuming both parental status and parental duties and obligations without going through the formality of a legal adoption. *T.B.*, 567 Pa. at 228-29. Like the courts in *H.S.H.-K.*, *E.N.O.*, and *V.C.*, the Pennsylvania Supreme Court balanced the rights of the natural parent against the rights of the child. The court commented that the presumption that a child's best interests are served by protecting the family from intrusions by third parties gives way when the child forms strong psychological bonds with a person who lives with the child, provides care to the child, and assumes the role of a parent in the child's eyes. *T.B.*, 567 Pa. at 230.

Britain counters that adoption is already available to same-sex parents in Washington, with accompanying constitutional requirements of parental consent or parental unfitness. *State ex rel. D.R.M.*, 109 Wn. App. at 191; RCW 26.33.120(1); RCW 26.33.160(1)(b). Thus, she argues that recognition of de facto parentage would create a "pseudo adoption" without these constitutional constraints. Britain's argument again misses the point. The de facto parentage rule recognized by other states *emphasizes the original consent of the legal parent to the relationship*, a protection recognized in Washington adoption statutes. Further, case law from other states has recognized the parental status of nonbiological partners even where the partners were un-

able, or did not choose, to adopt. *V.C.*, 163 N.J. at 209 (biological mother ended relationship with same-sex partner just after parties discussed adoption).

Amici for the ACLU, the Justice for Children Project, and the American Academy of Matrimonial Lawyers point out that the constitutional protections afforded to parent-child relationships extend to the child, protecting his or her right to maintain a relationship with a parent. Thus, they point out that recognition of a common-law de facto parentage cause of action would also recognize L.B.'s right to have a relationship with Carvin. *See, e.g., Moore v. City of E. Cleveland*, 431 U.S. 494, 504-05, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (recognizing that the United States Constitution protects the sanctity of the family and the family tradition, and that this tradition is not limited to nuclear families but includes entire families that share a household with parents and children); *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978) ("We have recognized on numerous occasions that the relationship between parent *and* child is constitutionally protected.") (emphasis added). *See also Troxel*, 530 U.S. at 88-89 (Justice Stevens, dissenting). We agree.

■ We find *H.S.H.-K., E.N.O., V.C.,* and *T.B.* to be persuasive authority for the existence of a common-law claim of de facto or psychological parentage. Washington courts also recognize that the importance of familial bonds accords constitutional protection to the parties involved in judicial determinations of the parent-child relationship, including the child, whether the State seeks to terminate a parent-child relationship or to establish one. *State v. Santos*, 104 Wn.2d 142, 146-47, 702 P.2d 1179 (1985). Further, as the cases recognizing de facto parentage recognize, a biological parent's rights as a fit parent do not necessarily trump a child's right to maintain a relationship with her de facto parent, a relationship that the biological parent both consented to and encouraged.

As discussed above, Washington case law has often recognized the need, and right, of specific individuals to seek

relief outside of statutory mechanisms. *Lundgren*, 94 Wn.2d at 95. *See also Kaur*, 11 Wn. App. 362 (recognizing statutory methods to obtaining child support from a parent are not exclusive). The *Allen* court recognized that in the context of family law "[j]udges are sometimes asked to exercise Solomonic wisdom in these matters." *Allen*, 28 Wn. App. at 639 (citations omitted).

We recognize that not all jurisdictions have recognized a de facto parent in similar situations. *See, e.g., In re Thompson*, 11 S.W.3d 913 (Tenn. Ct. App. 1999) (court declined to find either statutory or common-law de facto parentage claim for same-sex partner of biological mother who had been involved in child's conception and upbringing); *Nancy S. v. Michele G.*, 228 Cal. App. 3d 831, 279 Cal. Rptr. 212 (1991) (holding that although same-sex partner may have been able to prove her status as a de facto parent, such status was not sufficient to establish parental rights to custody and visitation over the objection of the biological mother). We find the cases from jurisdictions that do recognize the status to be more persuasive, however.

Washington courts already recognize the importance of the psychological bond between a child and caregiver. This bond has been sufficient to grant custody to a stepparent despite parental fitness of the biological father. *Allen*, 28 Wn. App. at 647-48. This bond has been sufficient to grant visitation to a man who may be biologically unrelated to a child but with whom the child has formed a significant de facto parent-child relationship. *McDaniels*, 108 Wn.2d at 310, 313. This court also left open the potential for recognizing the relationship established here, one of an "intended parent." *D.R.M.*, 109 Wn. App. at 195.

The court in *E.N.O.* asserted,

> The recognition of de facto parents is in accord with notions of the modern family. An increasing number of same gender couples, like the plaintiff and the defendant, are deciding to have children. It is to be expected that children of nontraditional families, like other children, form parent relationships with both parents, whether those parents are legal or de facto.

*E.N.O.*, 429 Mass. at 829. The cases from other jurisdictions that have recognized a common-law claim for de facto parentage also emphasize that its recognition protects the rights of children to maintain relationships with their psychological parents.

In sum, recognition of de facto parentage, in appropriate circumstances such as those alleged in this case, is in accord with existing Washington family law and reflects the evolving nature of families in Washington. Accordingly we hold that a common-law claim of de facto or psychological parentage exists in Washington such that Carvin can petition for shared parentage or visitation with L.B. Like the court in *H.S.H.-K.*, we hold that a petition for coparenting or visitation under this claim will not be entertained unless the petitioner proves the existence of a "parent-like relationship" with the child as well as a triggering factor, such as the legal parent's denial of visitation with the child. We also hold that the de facto parent-child relationship must have been formed with the consent and encouragement of the biological parent.

On remand, Carvin may prove the parent-child relationship by presenting sufficient evidence that: (1) the natural or legal parent consented to and fostered the parent-like relationship; (2) the petitioner and the child lived together in the same household; (3) the petitioner assumed obligations of parenthood without expectation of financial compensation; and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature. We also note that Carvin has presented strong evidence of several of these factors as indicated by the record on appeal and the trial court's original findings regarding the bond between Carvin and L.B. and the harm to L.B. when that bond was severed.

We are mindful of Britain's arguments regarding parental fitness and believe that the claim of de facto parentage sets forth adequate protections of a parent's constitutional rights to raise his or her children without unwarranted

intrusion. The common-law claim that we recognize today allows an action only when the biological or legal parent consents to the development of a parent-like relationship between the petitioner and the child, and the child is bonded with the de facto parent. Thus, the action exists only where the legal parent, having consented to and fostered the de facto parent-child relationship, has invited a third party into the relationship, effectively waiving the right to sever the relationship unilaterally.

III. Third Party Visitation Statute

 We also reinstate Carvin's alternative statutory third party visitation petition. We reverse the trial court's ruling that the United States Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), vitiates the claim. In *Troxel*, a plurality of the United States Supreme Court found RCW 26.10.160(3) to be unconstitutional as applied in that case. But that case has far different facts from this one. The grandparents in that case never had served as de facto parents of the children, whereas here, Carvin served as a de facto parent of L.B., with Britain's approval, for the first six years of the child's life. The mother in that case had not cut off all contact between the grandparents and the children, but only sought to reduce it, *Troxel*, 530 U.S. at 60-61, whereas here, Britain has cut off all contact between Carvin and L.B. The *Troxel* trial court had given no weight whatsoever to the presumption that a fit parent will act in the best interests of his or her child, *Troxel*, 530 U.S. at 69, whereas here, Britain fostered the parent-child relationship between L.B. and Carvin, and these too were the decisions of a presumptively fit parent.

The facts here show that L.B. grew from infant to little girl referring to Carvin as Mama and to Britain as Mommy—with Britain's full approval. Britain filled in the sections in L.B.'s baby book with entries describing Carvin as "mother" in place of anyone as "father." The two women named L.B. in honor of both their families. From all the evidence in the record, L.B. thrived under this arrange-

ment. And then, when it suited her purposes to do so, Britain cut off all contact between Carvin and L.B., causing the child substantial emotional distress for no good reason that is apparent in the record. Under Washington case law, as we have previously discussed, Carvin does not need to prove that Britain is unfit in the classic sense, but only that it is detrimental to the child to sever the very parent-child relationship that Britain first consented to and fostered. The trial court in this case needs to consider Britain's presumptively fit parenting decisions in their totality, not simply in isolation measuring from the date that she decided to end the parent-child relationship between Carvin and L.B. Nothing in *Troxel* states or implies to the contrary.

Finally, in *Troxel*, the trial court simply substituted its judgment regarding the children's best interests for those of the mother, with no deference to the decision made by a presumably fit parent. *Troxel*, 530 U.S. at 69-70. Here, the court was asked to consider visitation for Carvin as the child's psychological coparent. Just as Carvin has not alleged that Britain is unfit, Britain has not alleged that Carvin is unfit. Indeed, for the first six years of L.B.'s life, Britain entrusted L.B. to coparenting by Carvin. Certainly, RCW 26.10.160(3) must be applied in accordance with the principles of *Troxel* in order to withstand constitutional scrutiny, but the decision in *Troxel* is not a barrier to Carvin's claim. Instead, it provides a roadmap to constitutional application of the statute in determining Carvin's claim.

To this end, we commend the approach of Division Two of this court in *In re Custody of R.R.B.*, 108 Wn. App. 602, 31 P.3d 1212 (2001), *review granted*, 145 Wn.2d 1033 (2002). There, the court affirmed a decision of the trial court placing custody of a child with a nonparent even though her parents were fit because placing the child with the parents would be detrimental to the child's growth and development. *R.R.B.*, 108 Wn. App. at 606. In upholding the ruling, the appellate court was guided by the principles set down in

*Troxel*; in *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998), *aff'd sub nom. Troxel*, 530 U.S. 57; in *In re Custody of Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989); and in *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981). The *R.R.B.* court concluded that RCW 26.10.100, the third-party custody statute, was constitutional as construed because the two-part *Allen* standard, which is now embodied in the statute, recognizes the presumption that a fit parent will act in the best interests of the child, and because the remedy is narrowly tailored to further the State's interest in protecting the welfare of children. 108 Wn. App. at 615. Finally, the *R.R.B.* court concluded that the statute was constitutional as applied because the evidence supported the trial court's determination that the growth and development of the child would be detrimentally affected by placement with her parents. That approach persuades us, here, that the third-party visitation statute is facially valid when construed in accord with the principles of *Troxel*, and that the statute can be constitutionally applied in this case.

IV. Necessary Parties

Britain asks that we hold John Auseth to be a necessary party to Carvin's action under CR 19. The trial court has not yet ruled on this motion, and we refer it back to the trial court for a decision following remand. We decline to grant Britain's request that we direct the trial court to enter judgment that Auseth is L.B.'s legal father. Mr. Auseth has not intervened in the action, and he has sought no relief from any court in this matter. The surviving parentage claim is for determination of common-law parentage, and is not an action under the 2002 UPA. Questions of fact remain, and important questions of law have yet to be determined with respect to Auseth's legal status.[3] More-

---

[3] For example, a sperm donor is not a parent as defined by the 2002 UPA. *See* RCW 26.26.705. RCW 26.26.300 provides that a man claiming to be the father of the child conceived as the result of his sexual intercourse with the mother may sign an acknowledgement of paternity with intent to establish his paternity. According to the record in this case, L.B. was not conceived by an act of sexual intercourse. An "alleged father" does not include a male donor. RCW 26.26.011(3)(c). *But see* RCW 26.26.116(1)(d). The parties have not briefed the

determined with respect to Auseth's legal status.[3] Moreover, Britain's request for affirmative relief on behalf of Auseth is raised for the first time in this appeal.

We do point out, sua sponte, that the child L.B. is a necessary party to the common-law parentage action. Although the 2002 UPA does not name the child as a necessary party but only as a permissive party, *see* RCW 26-.26.555, our Supreme Court in *State v. Santos*, 104 Wn.2d 142, 146-47, 702 P.2d 1179 (1985) held that constitutional considerations require that children be parties to actions determining their parentage, and that the child must not be a party in name only. Accordingly, following our remand, we direct that the court promptly appoint a guardian ad litem for L.B., that the guardian be served with Carvin's petition, and that the guardian answer the petition on behalf of the child.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

AGID and BECKER, JJ., concur.

Review granted at 152 Wn.2d 1013 (2004).