IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Parentage of A.P.: | ) | No. 82839-8-I |
| | ) | |
| TARA MARTIN, | ) | DIVISION ONE |
| | ) | |
| Appellant, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL MARTIN and KRISTIN PRUST, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

HAZELRIGG, J. — Tara Martin filed for a petition for de facto parentage based on her relationship with A.P. The petition was separately opposed by both A.P.'s legal guardian, who is also Tara's[1] ex-husband, and A.P.'s mother. After trial, the court determined Tara had failed to establish three of the seven statutory elements contained within RCW 26.26A.440. Tara now appeals, raising numerous challenges to the trial court proceedings. Finding no errors, we affirm.

FACTS

A.P. was born in 2005 and lived with one or both of her biological parents until 2013. A.P.'s parents had divorced in 2010 and her biological father, Bill Prust, was named her primary residential parent. Two months later, her parents

---

[1] Because several parties to this case share last names, we refer to them by their first names. No disrespect is intended.

reconciled. Bill then died in January 2012 when A.P. was nearly seven years old. Both A.P. and her mother, Kristin Prust, were devastated by Bill's death and struggled in the immediate aftermath, during which some other traumatic family events occurred.

Dealing with her grief and other health issues, Kristin was no longer able to work and was ultimately granted long term disability benefits. A.P. was having behavioral issues including hyperactivity, disruptive conduct in class, and difficulty concentrating. In 2013, Kristin moved herself, her son, and A.P. to Malaysia where Kristin's father lived. Though A.P.'s brother adjusted well, A.P. did not. After four months, A.P. and her mother returned to Washington as it was clear A.P. needed more structure than that which was provided by her homeschooling in Malaysia.

When A.P. and Kristin returned to Washington in 2013, A.P. was eight years old. The two initially stayed with Daniel Martin, a close friend to Kristin and Bill. Daniel was living with his then wife, Tara, and her son from a previous relationship, C.C., who was two-years-old at the time. Daniel knew A.P. well and was her godfather. Daniel offered to care for A.P. based on some conversations that he had with Bill prior to his death regarding care of A.P. Believing this would be in her daughter's best interests, Kristin agreed to a nonparental custody order designating Daniel as A.P.'s guardian. The agreed order was entered in July 2014 and, while Kristin was aware Tara, as Daniel's wife, would likely assist in parenting A.P., she only named Daniel as guardian in the nonparental custody order. Kristin maintained regular contact with A.P. for the first year of the new custody

arrangement until medical issues arose which impacted her ability to see her daughter regularly.

In fall 2014, Kristin stopped visits with A.P. based on health-related limitations on contact imposed by Daniel and Tara, though she did maintain some infrequent communication with her daughter. By January 2015, Tara had transitioned to staying home full-time in order to care for her son who has special needs. As a result, Tara ensured both C.C. and A.P. were cared for on a day-to-day basis. Not long after she began living with Daniel and Tara, A.P. started medication to address some of her behavioral concerns. Tara later returned to full-time employment outside the home in August 2018.

Tara and Daniel separated in early 2019, following Daniel's arrest arising from an alleged domestic violence incident. After Daniel was arrested, Tara sent A.P. to go stay with a close friend of Daniel's for the night. The following day, Daniel's brother picked A.P. up from the friend's house and took her to his home. A pretrial order pursuant to the pending criminal charge temporarily restricted Daniel from being with A.P. unless another adult was present. As a result, A.P. and Daniel resided with his family until the restriction was lifted, approximately six months, and Daniel was able to find his own home for himself and A.P. From that period on, A.P. had minimal contact with Tara, but regularly spent time with Daniel.

In June 2019, four months after she sent A.P. out of her home, Tara filed a petition for nonparental custody, or alternatively, de facto parentage. Daniel and Kristin objected to Tara's petition based on lack of adequate cause. In October 2019, a court commissioner agreed and found no adequate cause to support

Tara's petition for nonparental custody. The commissioner nevertheless found "sufficient information for the court to determine that Ms. Martin may be a de facto parent under [RCW] 26.26A.440." The commissioner denied Tara's request for residential time, but did appoint a guardian ad litem (GAL). Tara was ordered to pay the GAL fees, but the court indicated that it would consider reapportionment of the fees if any of the parties sought to revisit the issue.

In November 2019, a judge denied Daniel and Tara's cross-motions for revision of the commissioner's ruling. Following replacement of the designated GAL on two separate occasions, the third appointed GAL issued a report in October 21, 2020 recommending against de facto parentage. A trial was conducted over several days in March and April 2021. Numerous witnesses were called by all parties, but A.P. did not testify at trial. The court entered findings of fact and conclusions of law and a final order denying Tara's parentage petition. Tara timely appealed.

ANALYSIS

I.    Common Law or Statutory Standard for De Facto Parentage

As a preliminary matter, we reject Tara's argument that the proper framework for consideration of her petition for de facto parentage is the common law standard which existed prior to the legislature's enactment of RCW 26.26A.440. RCW 26.26A.440 became effective on January 1, 2019 and contains the statutory elements for de facto parentage. Tara filed her petition June 17, 2019, nearly six months after the enactment date, therefore the statute applies. The crux of Tara's argument on this issue is that because the majority of the

relationship with A.P. which she says supports a finding of de facto parentage arose during the period of time when the court utilized a common law standard, her case should be considered under that framework. Tara fails to persuasively argue why the statute in effect at the time she filed her petition does not control.

A common law remedy only survives the enactment of a statutory remedy if our "'legislature has not expressed an intention to preempt the common-law remedy and the common law remedy fills a void in the law.'" In re Parentage of C.S., 134 Wn. App. 141, 153, 139 P.3d 366 (2006) (quoting In re Parentage of L.B., 121 Wn. App. 460, 476 n.2, 89 P.3d 271 (2004)). Further, this challenge to the validity of the proceedings was not raised in the trial court. For example, the commissioner expressly noted that Tara "may be a de facto parent under [RCW] 26.26A.440" in ruling on adequate cause and the GAL report clearly utilizes the statutory elements contained in RCW 26.26A.440 in reaching its recommendation. The record establishes that Tara did not object to the commissioner's consideration of her petition under the statute or to the GAL report based on use of a purportedly erroneous standard. Neither did she object to the court's final ruling on that basis when it similarly applied the controlling statutory framework. Accordingly, we decline to consider such argument for the first time here. RAP 2.5(a).

The same is true as to Tara's constitutional challenge to RCW 26.26A.440. She asserts that the statutory standard for de facto parentage violates her fundamental right to parent. As a preliminary matter, this argument is not well taken as it, too, is raised for the first time on appeal and Tara does not attempt to

argue that this issue is manifest such that we should consider it. See RAP 2.5(a). Further, and more critically, Tara is not entitled to constitutional protection in this regard because, since she is not a parent of A.P., she does not have a fundamental right to parent A.P. Finally, Tara frames this constitutional argument as entitling her to parity with Daniel as A.P's legal guardian in terms of the court's consideration of their competing claims. However, this ignores the critical fact that Kristen remains A.P.'s legal and biological parent with full rights over her child. Tara offers no argument as to how her perspective of what is best for A.P. as a prospective de facto parent might override the wishes of an actual legal parent whose rights have not been forfeited or limited in any way.

II.     Trial Court Findings and Ruling on De Facto Parentage

Tara next assigns error to the trial court's denial of her petition for de facto parentage and the findings of fact and conclusions of law entered with that ruling.[2] We review a trial court's decision as to de facto parentage for abuse of discretion. See In re Parentage of J.A.B., 146 Wn. App. 417, 422, 191 P.3d 71 (2008). This court reviews the trial court's findings of fact for substantial evidence and considers the conclusions of law de novo, ensuring they properly flow from the findings. In re Custody of SA-M, 17 Wn. App. 2d 939, 952, 489 P.3d 259 (2021). "[A]n appellate court considers the evidence in a light most favorable to the prevailing

---

[2] Tara also assigns error to the commissioner's determination that she failed to meet the adequate cause standard as to her third party custody petition. However, her notice of appeal only designates the final order of the trial court denying de facto parentage and the accompanying findings of fact and conclusions of law. Accordingly, the ruling on adequate cause, and the subsequent denial of Tara's motion to revise that ruling, are outside the scope of this appeal. RAP 2.4(a)

party to determine if a rational trier of fact could find the fact more likely than not to be true." Id. Further, all unchallenged findings of facts are verities on appeal. In re Custody of A.T., 11 Wn. App. 2d 156, 163, 451 P.3d 1132 (2019). Though Tara assigns error to multiple findings, she does not provide substantive argument or otherwise demonstrate how they are not supported by substantial evidence. See Kauzlarich v. Yarbrough, 105 Wn. App. 632, 652 n.5, 20 P.3d 946 (2001) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."). Therefore, we treat the trial court's findings as verities.

"Effective January 1, 2019, the Washington Uniform Parentage Act (WUPA), [chapter] 26.26A RCW, was updated to provide statutory recognition of de facto parents." SA-M, 17 Wn. App. 2d at 948. RCW 26.26A.440 "provides a statutory path to legal parentage for de facto parents, who, loosely speaking, are adults who, with the consent and encouragement of a legal parent, have formed a strong parent-child relationship with a child." In re Parentage of J.D.W., 14 Wn. App. 2d 388, 398, 471 P.3d 228 (2020). RCW 26.26A.440 requires an individual who claims to be a de facto parent to establish the following seven elements by a preponderance of the evidence:

> (a) The individual resided with the child as a regular member of the child's household for a significant period;
> (b) The individual engaged in consistent caretaking of the child;
> (c) The individual undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation;
> (d) The individual held out the child as the individual's child;
> (e) The individual established a bonded and dependent relationship with the child which is parental in nature;
> (f) Another parent of the child fostered or supported the bonded and dependent relationship required under (e) of this subsection; and
> (g) Continuing the relationship between the individual and the child is in the best interest of the child.

If the trial court finds the individual has met their burden, the trial court "shall adjudicate the individual who claims to be a de facto parent to be a parent of the child." Id.

Here, the trial court definitively found Tara failed to establish at least two of the elements necessary for de facto parentage and reached a mixed finding as to a third element. The two elements not met were (f) and (g). As to (f), the court concluded that Tara had failed to demonstrate that "at least one of the child's parents foster or support [Tara]'s bonded and dependent relationship with the child." The trial court noted A.P.'s biological mother granted nonparental custody to Daniel alone and that Kristin testified that this was a "conscious and clear decision on her part." The trial court found that Kristin "of course, knew that [Tara] would be caring for A.P. to assist [Daniel], but she did not support [Tara]'s forming of a bonded and dependent relationship with A.P." Though Tara assigns error to this finding, she provides no argument as to why it is unsupported by the trial record, therefore we treat the finding as true for purposes of our review. We further note that Kristin's testimony provides substantial evidence to support this finding.

Next, the trial court concluded as to element (g) that it was not in A.P.'s best interest for the relationship with Tara to continue. The trial court's conclusion here is supported by its finding that A.P. is "in a good place right now, despite all that has happened since the separation, including the onset and continuation of the current COVID-19 crisis."[3] The court went on to note A.P.'s expressed desire not to have contact with Tara at this point in time and that forced reunification would

---

[3] The element regarding the best interest of the child is extremely context dependent and often requires substantial discovery. See J.D.W., 14 Wn.2d at 411–12.

require a parenting assessment and potentially additional counseling. The court was disinclined to add these requirements into the life of an adolescent who was already engaged in counseling for her various behavioral diagnoses and who had settled into new patterns with her guardian and mother. The trial court noted its reliance on the GAL's expertise and A.P.'s own statements in reaching its determination as to this statutory factor. The trial court's findings are supported by substantial evidence in the record and the conclusion as to A.P.'s best interest properly flows from such findings. Despite Tara's desire to have this court reweigh the evidence underlying this element that is not the role of an appellate court. See Renz v. Spokane Eye Clinic, PS, 114 Wn. App. 611, 623, 60 P.3d 106 (2002) ("Appellate courts are not suited for, and therefore not in the business of, weighing and balancing competing evidence.").

As to the final the element Tara failed to definitively establish, whether she had "a bonded and dependent parental relationship with the child," the court reached a mixed finding, answering both yes and no. Its mixed conclusion was based on temporal considerations regarding the relationship as the court found Tara and A.P. were bonded during the time they lived together, but that the bond they had previously shared was not sufficiently strong to survive their separation. Specifically, the court based this conclusion on A.P.'s lack of interest in seeing Tara since she was sent away from Tara's home and Tara's lack of efforts to maintain contact with A.P. even during the pendency of her petition for de facto parentage. The trial court's findings as to this element are supported by substantial evidence from the record. Its conclusion on this element is properly supported by

the findings and precludes a determination that Tara has met the statutory criteria as a de facto parent.

The court, and GAL, properly used the statutory elements in effect at the time of Tara's petition for de facto parentage. Further, the court's findings regarding those statutory elements are supported by substantial evidence and the conclusions of law flow from those findings. Accordingly, we find no error in the trial court's denial of Tara's petition.

III.    GAL Report on A.P.'s Preference as Hearsay

Tara next raises an evidentiary error, arguing the court improperly considered A.P.'s preferences as conveyed in the GAL report. She specifically asserts this was improper hearsay because A.P. did not testify at trial. In advancing this argument on appeal, Tara notes her objection at trial to hearsay statements contained in the GAL report, seeking that the court limit their use to supporting the "[GAL]'s opinions in this matter and not [ ] for the purpose of substantive evidence." Tara raised this objection when Daniel moved to admit the report. However, a careful reading of the transcript establishes that this ruling was clearly limited to hearsay statements contained in the report that arose from the GAL's interviews with other collateral informants. The record does not support Tara's claim on appeal that this ruling was intended to capture A.P.'s preferences as conveyed to the GAL during his investigation.

As with several of the other issues addressed herein, this is a challenge Tara raises for the first time on appeal. She did not object to the court's consideration of A.P.'s preference based on hearsay, nor did she present such an

objection to the order that expressly directed the GAL to determine, and report back on, A.P.'s preference. While it is true that A.P. did not testify at the trial, the GAL report contained statements regarding A.P's preference, and that the statements in the GAL report regarding A.P.'s wishes were considered by the court in reaching its final ruling, this was not error.

## IV.    Reapportionment of GAL Fees

Finally, Tara assigns error to the trial court's order as to GAL fees, specifically arguing that the fees should have been reapportioned at the conclusion of the trial. However, this argument is waived as it was not properly presented to the trial court. After ordering Tara solely responsible for the GAL fees at the conclusion of the adequate cause hearing, the court explicitly stated it was willing to "revisit" the apportionment of the fees at the request of any party. While Tara claims a request for reapportionment was built into her proposed orders, those documents are not part of the record on appeal.[4] Further, the report of proceedings demonstrates that she did not ask the court to reallocate or otherwise revisit the GAL fees at the conclusion of trial. We will not consider new arguments on appeal which were never presented to the trial court. RAP 2.5(a).

---

[4] The record shows that Tara's proposed orders were rejected by the clerk's office at the trial court based on King County Local Court Rule 7(b)(5)(C), which does not allow for the filing of proposed orders.

Affirmed.

WE CONCUR: