191 P.3d 71 (2008)
In the Matter of the PARENTAGE of J.A.B., minor child,
Richard Benjamin, Respondent, and
Snowwhite Reich, Appellant.
In the Matter of the Parentage of B.H.R., minor child,
Richard Benjamin, Respondent, and
Snowwhite Reich, mother, Appellant,
Robert Henry, father, Respondent.
No. 59165-7-I, 59169-0-I.
Court of Appeals of Washington, Division 1.
August 25, 2008.
*72 Robert Henry, Cliffwood, NJ, Emily Jennifer Tsai, Tsai Law Company PLLC, Seattle, Counsel for Respondents Richard Benjamin and Robert Henry.
David George Kontos, Attorney at Law, Kent, Counsel for Appellants Snowwhite Reich.
ELLINGTON, J.
¶ 1 This case involves a petition for recognition as a de facto parent. The trial court here found that Richard Benjamin is the de facto parent of B.H.R. This finding is supported by the record and was not an abuse of discretion. Nor did the court err in its parenting plan decisions. We thus affirm.

BACKGROUND
¶ 2 In 1998, Snowwhite Reich and her four month old son B.H.R. began living with Richard Benjamin. Reich and Benjamin lived together as a family for seven years and had a child together, J.A.B. B.H.R. considers Benjamin to be his father, and has called him "dad" since he could first speak. B.H.R.'s biological father, Robert Henry, lives in another state and maintains only periodic contact.
¶ 3 Until she began showing symptoms of mental illness, Reich worked part time and was the children's primary caregiver. In February 2005, she became imbued with frenetic energy, stopped sleeping, and began speaking in rhyme. She became delusional. Eventually she became mute and communicated only through written notes.
¶ 4 Reich was hospitalized for 11 days. Doctors diagnosed bipolar affective disorder and prescribed mood stabilizing and antipsychotic medication.
¶ 5 Reich did not accept her diagnosis and disliked the side effects of the medication. Despite several adjustments to the regimen, she stopped taking her medication, precipitating a relapse. She again became paranoid and anxious, exhibiting the same type of frenetic energy as before and speaking in rhyme. She threatened suicide. At one point she became assaultive, and Benjamin called police for help. Reich was hospitalized again. Benjamin was awarded temporary custody of both children.
¶ 6 In May, Reich was again hospitalized, suffering "from mental disorder characterized by alternating patterns of mania and depression, disorganization, paranoia, and catatonia."[1] She remained in the hospital for almost three weeks. She was again diagnosed with multiaxial bipolar affective disorder, and was again prescribed a medication regimen.
¶ 7 When she was released, the parties attempted to reconcile. Reich remained compliant with her treatment and was able to care for the children without supervision until September.
¶ 8 The custody actions remained pending. Through the years, B.H.R.'s biological father Henry had never objected to Benjamin's role. But in June 2005, Henry submitted a declaration opposing Benjamin's petition for nonparent custody of B.H.R. He characterized it as an honorable effort to provide protection for B.H.R. in relation to Reich, whom Henry described as "very volatile at times."[2] Henry acknowledged "serious evidence of the mother's danger to the child."[3] Henry maintained, however, that he himself was a fit parent for B.H.R., and requested temporary custody.
¶ 9 Then in October 2005, the parties appeared headed for agreement. Benjamin filed a petition to adopt B.H.R., in which *73 Reich joined and which (in a reversal not fully explained by the record) Henry also supported, consenting to the adoption and to termination of his parental rights. The petition did not go forward, however, possibly because, also in October, Reich again stopped taking her medication. Her behavior became increasingly erratic. Benjamin took a leave of absence to care for the children.
¶ 10 In February 2006, Reich physically attacked Benjamin, and the two permanently separated. Reich moved in with her parents. The children stayed with Benjamin, who amended his petition to add a de facto parent cause of action.
¶ 11 At trial on the petition, some 10 witnesses testified, including experts on both sides. Reich contested the evidence of her illness and disputed Benjamin's role. Henry no longer sought custody and instead argued B.H.R. should reside primarily with Reich. The court-appointed parenting evaluator recommended that Benjamin have custody of both children.
¶ 12 The trial court applied the criteria set out in In re Parentage of L.B.,[4] and found that Benjamin is B.H.R.'s de facto parent. The court also found that neither Reich nor Henry were suitable custodians under the nonparent custody statute.[5] But the court declined to rely upon that statute, ruling that Benjamin's right to parent B.H.R. "does not derive out of [that] . . . statute . . . but out of the common law."[6]
¶ 13 The court entered a parenting plan under which the children reside with Benjamin a majority of the time. As to B.H.R., the plan provides for residential time with all three parents.
¶ 14 Reich appeals both the designation of Benjamin as a de facto parent and the final parenting plan granting Benjamin primary residential placement of B.H.R. and J.A.B.[7]

DISCUSSION
¶ 15 Questions of law are reviewed de novo.[8] A ruling concerning the placement of a child is reviewed for abuse of discretion.[9] A court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.[10]

De Facto Parenthood
¶ 16 In 2005, our Supreme Court embraced the common law concept of de facto parenthood in L.B. The court recognized that the legislature cannot contemplate every potential scenario that may arise in familial relations.[11] Specific to L.B.'s situation, the legislature had provided no way to recognize the parental status of the former female partner of a birth mother, despite the fact that the partners had jointly decided to conceive the child and had raised the child together for over six years. The court found "no indication, in its enactments on the subject, that our legislature intended to provide the sole means of obtaining child custody." Citing the history of broad equitable powers vested in courts supervising the welfare of children,[12] the court observed that "our state's jurisprudence strongly suggests the continued viability of common law custodial actions,"[13] and held that under the common law, a person who meets certain stringent criteria may be recognized as a de facto parent.[14]
*74 ¶ 17 A de facto parent is an adult who has "`fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life,"'[15] with the consent of the legal parent in the same household, without expectation of financial compensation, and for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature.[16]
¶ 18 Under L.B., a petitioner who meets this rigorous test may proceed, as any other legal parent, to establish a parenting plan and residential schedule under chapter 26.09 RCW. A petitioner who cannot make the required showing must proceed instead under the nonparent custody statute, chapter 26.10 RCW.
¶ 19 In 2007, this court decided In re Parentage of M.F.[17] There, the petitioner sought to be recognized as the de facto parent of his former stepdaughter. This court held the de facto parent doctrine unavailable, because "existing statutes permit a former stepparent to assert rights for residential time."[18] The court distinguished L.B. on the ground that, unlike less traditional family arrangements, blended families resulting from consecutive marriages are recognized in the existing statutory framework by way of the nonparent custody statute.[19] In sum, because the former stepfather could have sought residential time with M.F. under nonparent custody and visitation statutes,[20] the M.F. court held the de facto parent doctrine could not apply.
¶ 20 We find we must respectfully disagree with our colleagues.
¶ 21 First, we question the M.F. court's approach to procedure. Instead of beginning with an initial factual determination of whether a petitioner is a de facto parent and then applying the appropriate statute, M.F. requires any person who is not a legal parent to proceed under statutes designed for nonparents. But if a person is a de facto parent, he or she is not a "nonparent."
¶ 22 We also do not believe L.B. is distinguishable. The nonparent custody statute is available to any person, not just stepparents, and so was equally available to the petitioner in L.B. That she made no effort to proceed under the statute was no bar to her petition for de facto parent status. Rather, in its extensive discussion of cases from other jurisdictions with similar statutory frameworks, the L.B. court recognized that the nonparent custody statute is an inadequate remedy for a person seeking parental status. In Holtzman v. Knott (In re H.S.H.-K.),[21] for example, the former partner of a birthmother had no standing under a nonparent custody statute similar to our own because she could not show the birthmother to be "unfit or unable to care for the child."[22] This inadequacy is the premise of that and other cases, cited with approval in L.B., recognizing a common law cause of action for de facto parenthood.[23]
¶ 23 Nor can we see a distinction, for purposes of this analysis, between blended families resulting from consecutive marriages and blended families resulting from nonmarital relationships. In L.B., no marital relationship existed between the petitioner and the biological parent because none was possible. In M.F., petitioner had been a legal stepparent. Here, Benjamin and Reich never married, but presumably could have. These differences in relationship history have great consequence under M.F., apparently on *75 grounds that the legislature contemplated consecutive marriages even if it did not contemplate less traditional family arrangements.
¶ 24 But these are differences in the legal relationships of the adults. We are unable to see their relevance to the question here: whether a person who is not the legal parent of a child is in fact the child's parent, and should be recognized as such by a court of equity.
¶ 25 The nonparent custody statute does not address that question at all. Rather, it operates only where there is no available, suitable legal parent. The statute permits nonparent custody only where the child does not currently reside with a legal parent, or the legal parents are shown to be unsuitable custodians.[24] A parent is unsuitable only when unfit, or when placing the child with that parent would cause "actual detriment to the child's growth and development."[25] The statute is thus aimed at protecting children without fit parents or children whose extraordinary circumstances render placement with a fit parent detrimental to the child's growth and development.[26] The statute focuses on the relationship between the legal parent and the child, not that between the petitioner and the child. Indeed, no statute contemplates the latter relationship, which is why there was no adequate statutory remedy in L.B.
¶ 26 More fundamentally, residential placement is not equivalent to parental status. The nonparent custody statute and the de facto parent doctrine have very different purposes. A nonparent custody order confers only a temporary and uncertain right to custody of the child for the present time, because the child has no suitable legal parent. When and if a legal parent becomes fit to care for the child, the nonparent has no right to continue a relationship with the child.
¶ 27 Parenthood comprises much more than mere custody. A parent has a fundamental liberty interest in the care, custody, and control of his or her child.[27] One who meets the rigorous test that defines a de facto parent stands in legal parity to an otherwise legal parent, and therefore is vested with the same parental rights and responsibilities, limited only by the best interests of the child.[28] The nonparent custody statute cannot provide an adequate remedy to one who meets the stringent de facto parent criteria.
¶ 28 We do not believe the L.B. court intended to limit the de facto parent doctrine to parties who have no legal right to marry, leaving to all others the very limited avenue of the nonparent custody statute. We therefore depart from the M.F. reasoning, and hold the de facto parent doctrine does not depend upon the availability of the nonparent custody statute.

Benjamin is a De Facto Parent to B.H.R.
¶ 29 As set forth above, a de facto parent must be an adult who has "`fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.'"[29] Such a relationship may be recognized only where "`(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature.'"[30] Benjamin meets these strict criteria.
¶ 30 Benjamin and B.H.R. have resided together since 1998, when B.H.R. was only four months old. B.H.R. has always considered *76 Benjamin his father, and Benjamin has fully embraced that role. Henry and Reich fostered this parent-like relationship, as is evident from the history of Benjamin's relationship with Reich and by Reich's and Henry's initial support of Benjamin's attempt to adopt B.H.R. Even at trial, Reich and Henry agreed Benjamin has acted as a good father to B.H.R. and that B.H.R. should maintain contact with him. There is no evidence that Benjamin had any expectation of remuneration; child support payments from Henry were expended for B.H.R.'s benefit and not to compensate Benjamin. The evidence plainly shows that Benjamin has developed a bonded, dependent, parent-like relationship with B.H.R., and that he has fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in B.H.R.'s life. The trial court so found, and its findings are amply supported by the record. The court did not err in recognizing Benjamin as B.H.R.'s de facto father.

Residential Placement of J.A.B.
¶ 31 Reich makes her argument concerning J.A.B. in one sentence: "[I]f the trial court had properly applied the law as to the child B.H.R., then the court would have to reassess the placement of the younger child [J.A.B.] to Richard Benjamin."[31]
¶ 32 Reich's argument appears to rest on the assumption that the court made the same residential placement for both children because they enjoy a particularly close relationship. Substantial evidence would support a finding to that effect, but the trial court did not make that finding. Its decision instead emphasizes Reich's failure to appreciate "the severity in which her mental health episodes disrupted her parenting of the children."[32]
¶ 33 Given the evidence of Reich's mental instability and resistance to her diagnosis and treatment, the court reasonably determined it would be in J.A.B.'s best interests to reside primarily with Benjamin. Indeed it is difficult to see how the court could have reached a different conclusion. The court did not abuse its discretion here.
¶ 34 Affirmed.
WE CONCUR: AGID, APPELWICK, JJ.
NOTES
[1] Report of Proceedings (Aug. 8, 2006) at 75.
[2] Clerk's Papers at 6.
[3] Id.
[4] 155 Wash.2d 679, 122 P.3d 161 (2005), cert denied, 547 U.S. 1143, 126 S.Ct. 2021, 164 L.Ed.2d 806 (2006).
[5] The court found that Reich "is capable of parenting the child(ren), but she lacks insight into the severity in which her mental health episodes disrupted her parenting of the children." Clerk's Papers at 68.
[6] Id. at 141.
[7] Henry has not participated in this appeal.
[8] Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 880, 73 P.3d 369 (2003).
[9] In re Marriage of Kovacs, 121 Wash.2d 795, 801, 854 P.2d 629 (1993).
[10] Id.
[11] 155 Wash.2d at 706, 122 P.3d 161.
[12] Id. at 697, 122 P.3d 161.
[13] Id. at 699, 122 P.3d 161.
[14] Id. at 708, 122 P.3d 161.
[15] Id. (quoting C.E.W. v. D.E.W., 2004 ME 43, 845 A.2d 1146, 1152 (2004)).
[16] Id.
[17] 141 Wash.App. 558, 561, 170 P.3d 601 (2007).
[18] Id. at 565, 170 P.3d 601.
[19] Id. at 570, 170 P.3d 601.
[20] RCW 26.10.030; RCW 26.09.240 (held unconstitutional in In re Parentage of C.A.M.A., 154 Wash.2d 52, 66, 109 P.3d 405 (2005)).
[21] 193 Wis.2d 649, 665-66, 533 N.W.2d 419 (Wis. 1995).
[22] The same would have been true in L.B. See 155 Wash.2d at 709, 122 P.3d 161 (noting there was no indication that L.B.'s birth mother is in any way unfit as a parent).
[23] See L.B., 155 Wash.2d at 702-06, 122 P.3d 161.
[24] RCW 26.10.030.
[25] In re Custody of Shields, 157 Wash.2d 126, 144, 136 P.3d 117 (2006).
[26] Id.
[27] L.B., 155 Wash.2d at 710, 122 P.3d 161.
[28] Id. at 708, 122 P.3d 161.
[29] Id. (quoting C.E.W. v. D.E.W., 2004 ME 43, 845 A.2d 1146, 1152).
[30] Id. (quoting In re Parentage of L.B., 121 Wash. App. 460, 487, 89 P.3d 271 (2004)).
[31] Appellant's Br. at 7.
[32] Clerk's Papers at 68.