FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE    NOV 2 7 2013

CHIEF JUSTICE

This opinion was filed for record
at _8:00 a.m._ on _11/27/13_

Ronald R. Carpenter
Supreme Court Clerk

This opinion was filed for record
at _____
Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In the Matter of the Custody of A.F.J. | ) | No. 86188-9 |
| | ) | |
| MARY FRANKLIN, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | En Banc |
| v. | ) | |
| | ) | |
| JACKIE JOHNSTON, | ) | |
| | ) | Filed    NOV 2 7 2013 |
| Petitioner. | ) | |
| | ) | |

GONZÁLEZ, J.—Washington State law recognizes that a parental bond with a child may be formed in many ways. *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005). In *L.B.*, we adopted the common law test established by the Wisconsin courts to determine whether a person was the de facto parent of a child. A de facto parent "stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise." *Id.* at 708. The primary question before us is whether de facto parent status can be established based partially on facts that arose during a foster placement. While in most circumstances a foster parent will not be able to meet the criteria set forth in *L.B.*, we find that foster parent status is not itself

an absolute bar to establishing de facto parentage and that the court can consider facts that arose during a foster care placement. We also find sufficient evidence on this record to affirm the trial court's conclusion that Mary Franklin is A.F.J.'s de facto parent. We affirm.

FACTS

Mary Franklin and Jackie Johnston began seeing each other in about 2002. Their relationship was complicated by the distance between their primary homes and Johnston's drug use. While they only lived together sporadically over the next few years, Franklin testified that Johnston had been her domestic partner. Among other things, Johnston arranged for Franklin to be covered by Johnston's health insurance and arranged many courses of drug rehabilitation.

Franklin and Johnston broke up and reconciled many times. During one of the periods they were separated, and while Johnston was heavily using crack cocaine, she became pregnant. She called Franklin for help, and Franklin responded. Johnston later testified that "Mary Franklin rescued me." Clerk's Papers (CP) at 535. The two women decided to parent the expected child together. Johnston moved back to Seattle and enrolled in an inpatient drug treatment program at Swedish Hospital in Ballard. After completing a 41-day program, she moved back in with Franklin. Unfortunately, while Franklin was out of town vacationing with her parents, Johnston relapsed and attempted suicide. Johnston was eight months pregnant at the time. In response, Johnston enrolled herself into an inpatient perinatal treatment program in October

2

2005. While she was in the program, her son, A.F.J. was born. While Johnston was not present at A.F.J.'s birth, he bears both their surnames and Franklin suggested his first.

After Johnston left the treatment program, she moved into "Clean and Sober" housing. She stayed there only a few days before she and A.F.J. moved in with Franklin. Unfortunately, Johnston relapsed again several months later. After finding Johnston passed out with a broken glass crack cocaine pipe and A.F.J. on the bed, Franklin called Child Protective Services (CPS). CPS removed A.F.J. from the house and put him in protective custody. Three days later, at the shelter care hearing, Johnston requested A.F.J. be returned to Franklin's care. A.F.J. was returned to Franklin, on the condition that she pursue a foster parent license.

In 2006 and 2007, Johnston suffered many relapses and spent time in many different inpatient and outpatient treatment programs, and in the King County jail. In early 2007, the Department of Social and Health Services filed a petition to terminate her parental rights. In November 2007, Franklin filed a nonparental custody petition and sought a declaration she was A.F.J.'s de facto parent.

In January 2008, Commissioner Hillman found adequate cause to allow Franklin to pursue both nonparental custody and de facto parentage. In May 2009, Judge Prochnau dismissed the nonparental custody petition, finding that Johnston had "made remarkable progress despite some very onerous requirements by this Court and the dependency court." CP at 707. In extensive findings of fact and conclusions of

3

law, Judge Prochnau found that Franklin had established by clear, cogent, and convincing evidence that she was A.F.J.'s de facto parent under *L.B.*, 155 Wn.2d at 708. Both Franklin and Johnston appealed. The Court of Appeals solicited amicus briefing on whether the de facto parentage doctrine was available to foster parents and whether the trial court properly applied the doctrine. Legal Voice and the Center for Children and Youth Justice and the American Academy of Matrimonial Lawyers filed amicus briefs in support of Franklin, and the Department of Social and Health Services (DSHS) filed a brief in support of Johnston. The Court of Appeals affirmed, and once again, both sides sought review. We granted review only of Johnston's petition.

## ANALYSIS

We review questions of law de novo and findings of fact for substantial evidence. *Soltero v. Wimer*, 159 Wn.2d 428, 433, 150 P.3d 552 (2007) (citing *Nordstrom Credit, Inc. v. Dep't of Revenue*, 120 Wn.2d 935, 942, 845 P.2d 1331 (1993)). "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978) (citing *In re Welfare of Snyder*, 85 Wn.2d 182, 532 P.2d 278 (1975)). In *L.B.*, we adopted a four part test for establishing de facto parent status:

> "(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without

4

expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature."

*L.B.*, 155 Wn.2d at 708 (quoting *In re Parentage of L.B.*, 121 Wn. App. 460, 487, 89 P.3d 271 (2004)). "In addition, recognition of a de facto parent is 'limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.'" *Id.* (quoting *C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146, 1152). Johnston contends that the de facto parent doctrine is available only when there is a "statutory gap," which, she contends, Franklin has not demonstrated. Johnston, supported by DSHS, also argues that the time A.F.J. was in Franklin's care as a foster child should not be considered in determining whether Franklin has satisfied the elements of de facto parentage and that Franklin has not established three of the *L.B.* elements.[1] Finally, Johnston contends Franklin did not undertake a permanent, unequivocal, committed, and responsible parental role in A.F.J.'s life. Jackie Johnston's Suppl. Br. at 4.

We turn first to Johnston's suggestion that Franklin must demonstrate the existence of a statutory gap to maintain a de facto parentage action. *Id.* While the existence of a statutory gap was a factor in this court's decision to adopt the de facto parent doctrine in *L.B.*, nothing in *L.B.* suggests that a statutory gap itself is an element of the action to be established by the petitioner. Certainly, whether a

---

[1] Johnston does not dispute *L.B.*'s second factor: that A.F.J. and Franklin lived together in the same household. Jackie Johnston's Suppl. Br. at 4.

statutory gap exists is relevant to whether the court is prompted to apply an equitable remedy or whether the parties are limited to statutory avenues. *See In re Parentage of M.F.*, 168 Wn.2d 528, 532, 228 P.3d 1270 (2010). But *L.B.* clearly articulates the elements to be proved. The existence of a statutory gap is not among them. *L.B.*, 155 Wn.2d at 708. We note that the legislature has taken no action seeming to disapprove of our *L.B.* opinion. A bill was introduced in the 2006 legislature proposing to legislatively overrule *L.B.*, but it was not referred out of committee. S.B. 6742, 59th Leg., Reg. Sess. (Wash. 2006); *see*

http://dlr.leg.wa.gov/billsummary/default.aspx?year=2005&bill=6742. "If the legislature does not register its disapproval of a court opinion, at some point that silence itself is evidence of legislative approval." *1000 Friends of Wash. v. McFarland*, 159 Wn.2d 165, 181, 149 P.3d 616 (2006) (citing *State v. Coe*, 109 Wn.2d 832, 846, 750 P.2d 208 (1988)); *see also In re Custody of B.M.H.*, No. 86985-6, slip op. at 17 (Wash. Nov. 27, 2013) (noting that the legislature has taken no action to abrogate de facto parentage).

Johnston has presented no specific statutory remedy that was available to Franklin or shown that there is a meaningful difference between the statutory avenues available to Franklin today and the statutory avenues available to Sue Ellen Carvin in *L.B.* Our own review reveals none. Franklin could, and did, bring a petition for nonparental custody, but nonparental custody is not the equivalent to parentage. As the Court of Appeals rightly noted:

> The nonparent custody statute and the de facto parent doctrine have very different purposes. A nonparent custody order confers only a temporary and uncertain right to custody of the child for the present time, because the child has no suitable legal parent. When and if a legal parent becomes fit to care for the child, the nonparent has no right to continue a relationship with the child.

*In re Parentage of J.A.B.*, 146 Wn. App. 417, 426, 191 P.3d 71 (2008). At the time A.F.J. was born, neither domestic partnership nor same sex marriage was available in this State. RCW 26.04.010 (LAWS OF 2012, ch. 3, § 1 (Referendum Measure 74, approved Nov. 6, 2012)) (same sex marriage); RCW 26.60.010 (domestic partnership). We find the suggestion that the existence of a statutory gap is an element the petitioner must meet unavailing, and no adequate statutory remedy has been brought to our attention.

Next, we turn to whether a foster parent should face additional limitations beyond those set forth in *L.B.* when seeking recognition as a child's de facto parent. The State specifically asks us to hold that a foster parent "should only be found a *de facto* parent when the basis for the finding is established solely outside the dependency proceeding." Amicus Curiae Br. of DSHS at 5. Essentially, both DSHS and Johnston argue the State's compelling interest in protecting families will be undermined if we allow foster parents to petition for de facto parent status. We are not without sympathy to their concerns. We recognize that it would be highly disruptive to the foster care system and the State's compelling interest in family reunification if, by virtue of a short term placement by the State with a stranger or even a relative who has not previously held a parental role, a foster parent could seek

de facto parent status. But the first element that a petitioner must establish is that "the natural or legal parent *consented to and fostered the parent-like relationship.*" *L.B.*, 155 Wn.2d at 708 (emphasis added). That element already limits de facto parentage to cases where the natural or legal parent has consented to and fostered the parent-like relationship. Given the realities of dependency and termination actions, it is the State that consents and fosters the parent-like relationship, not the natural or legal parent. Even in situations where the legal parent has previously fostered a relationship between the foster parent and the child, such as, for example, with an aunt, uncle, or cousin, such relationships will rarely, if ever, be parental in nature.

Further, to establish de facto parent status under *L.B.*, the petitioner must establish that he or she "assumed obligations of parenthood without expectation of financial compensation." *Id.* Foster parents in Washington State assume their obligations with the expectation of some compensation. WAC 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 ("A basic rate payment . . . is paid to all foster parents to help cover the cost of food, clothing, shelter, and personal incidentals."). This element of *L.B.* also limits the number of people who can bring potentially meritorious de facto parentage petitions.

We hold that a person's status as a foster parent does not necessarily bar recognition of a person as a de facto parent, and we decline Johnston and the State's invitation to limit judicial review to facts that arise outside of the foster care relationship. As Amici Curiae Legal Voice and Center for Children & Youth Justice rightly note, "[t]he *de facto* parentage doctrine is an equitable doctrine that affords

8

trial courts flexibility to examine each unique case on a fact-specific basis." Br. of Amici Curiae Legal Voice and Center for Children & Youth Justice at 3. We leave it in the able hands of trial judges to determine whether, in each case, the elements have been met without imposing ratification limitations on the scope of the judges' review.

We turn at last to the challenged de facto parentage elements here. First, Johnston contends Judge Prochnau erred in finding Johnston had consented to and fostered a parent-like relationship between Franklin and A.F.J. Jackie Johnston's Suppl. Br. at 4; *see L.B.*, 155 Wn.2d at 708. While A.F.J.'s conception was not intended by either Johnston or Franklin, Johnston turned to Franklin for help when she discovered she was pregnant. They agreed to raise the child together, agreed to give the child both their names, and held each other out as coparents. Johnston's own trial brief in the termination case represented to the court that "Jackie was committed to Mary Franklin and viewed her as a life partner with whom she would raise [A.F.J.]." CP at 1088. Johnston testified that she had told other people Franklin was A.F.J.'s mother, that "[s]he's definitely a parent to [A.F.J.]," and that A.F.J. thinks of Franklin as "[o]ne of his mothers." CP at 499. Judge Prochnau heard testimony from Johnston's chemical dependency counselor that Johnston and Franklin "presented as partners in a relationship" and that Johnston had wanted Franklin to adopt A.F.J. "as part of the way for them all to be connected." Excerpted Trial Test. of Ken Fremont-Smith (Mar. 31, 2009) at 5, 8. Johnston testified that she told Children and Family Services in March 2006 that Franklin was her "co-parent," "partner," and "next of

9

kin." Excerpted Trial Test. of Johnston (hereinafter ETTJ) (Mar. 30, 2009) at 8-9. She acknowledged on the stand she told one of her treatment providers that she lived with her four month old son and her partner. We find substantial evidence in the record supports this finding.

Next, Johnston contends that Judge Prochnau erred in finding that Franklin had assumed the obligations of parenthood without expectation of financial compensation because she knew she would be receiving foster care payments "as early as April 2006." Jackie Johnston's Suppl. Br. at 12; *see L.B.*, 155 Wn.2d at 708. But Judge Prochnau found that "[i]t is absolutely clear that Ms. Franklin has been one of [A.F.J.'s] mommies since his birth[]" in 2005. CP at 711. At the time A.F.J. was born, Johnston and Franklin had planned that Franklin would continue to work as a nurse and Johnston would act as a stay-at-home parent. Only after Johnston and A.F.J. had come to live in Franklin's home and Johnston had relapsed did the subject of compensation arise, and then only after the State *required* Franklin become licensed as a foster parent as a condition of having A.F.J. returned to her. Franklin attempted to decline the payments and only acquiesced after a social worker told her that it would raise a "red flag" if she did not. ETTF (Mar. 26, 2009) at 39. Substantial evidence supports Judge Prochnau's conclusion that Franklin assumed the obligations of parenthood without expectation of compensation.

Johnston also contends that Judge Prochnau erred in finding Franklin had been in a parental role for a length of time sufficient to have established a bonded, parental

10

relationship with A.F.J. Jackie Johnston's Suppl. Br. at 4, 13; *see L.B.*, 155 Wn.2d at 708. At the time of trial, A.F.J. had lived with Johnston for three and a half years. Johnston herself acknowledged that A.F.J. called Franklin "Mommy Mary" and calls Franklin's home his home. ETTJ (Mar. 30, 2009) at 46. A.F.J. and Franklin lived together long enough to establish a bonded, parent-child relationship.

Johnston contends that Franklin has not fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in A.F.J.'s life. *See L.B.*, 155 Wn.2d at 708. While this is not properly speaking an element established by *L.B.*, it is a potential limitation on the reach of the doctrine. But the evidence canvassed above amply shows that Franklin had fully and completely undertaken such a role.

Finally, Johnston argues that recognizing Franklin as A.F.J.'s de facto parent unconstitutionally undermines Johnston's substantive due process right to parent her son. But this fails to recognize that "in Washington, a de facto parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise." *L.B.*, 155 Wn.2d at 708 (citing *C.E.W.*, 845 A.2d 1151-52).[2]

---

[2] Johnston argues strenuously that the parental rights of A.F.J.'s biological father were improperly terminated at least in part because Franklin, Johnston contends, knew the biological father's name and address. *E.g.,* Jackie Johnston's Suppl. Br. at 16 (citing ETTF (Mar. 26, 2009) at 40). Accordingly, Johnston reasons, Franklin should not be allowed to maintain a de facto parent petition. *Id.* But it does not appear that Franklin was a party to the termination action against the biological father filed by the State. We have been given no reason to disturb the trial court's termination order or entertain what is in essence a collateral challenge to it. Additionally, Franklin argues Johnston should be estopped from maintaining that Franklin is not A.F.J.'s de

11

CONCLUSION

Franklin has established she is A.F.J.'s de facto parent. While we recognize that a de facto parentage relationship will not arise out of a foster care relationship, foster parent status itself is no bar. We find sufficient evidence supports the trial court's findings. We affirm the courts below.

---

facto parent based on Johnston's own representations that Franklin is A.F.J.'s mother. Given our disposition of the case on the merits, we decline to reach this argument.

González, J.

WE CONCUR:

Owens, J.

Stephens, J.

Fairhurst, J.

Chambers, J.P.T.

13

*In re Custody of A.F.J.*

No. 86188-9

MADSEN, C.J. (concurring in dissent)—I agree completely with the dissent that the majority's new rule is much too broad and expands the de facto parent doctrine far beyond its foundation in *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005).

I write separately to emphasize that the majority's too-expansive approach comes with its concomitant failure to preserve a parent's constitutional rights to the care, custody, and control of her child. The majority concludes that conferring de facto parent status on Mary Franklin does not unconstitutionally infringe on Jackie Johnston's constitutional rights as a parent because conferring de facto parent status makes Franklin a parent with equal rights. Majority at 12. Thus, the majority decides that the very action claimed to be unconstitutional renders the action constitutional.

As I state in *In re Custody of B.M.H.*, No. 86895-6, slip op at 18 (Wash. Nov. 27, 2013) (Madsen, C.J., concurring in dissent), where the issue is whether a stepparent may seek de facto parent status after the marriage ends, "the fundamental rights a parent has in the care, custody, and control of her child are too precious to cast aside as no longer of any moment." In this case, as in *B.M.H.*, the majority applies a "loosely reframed de facto parent standard" that deprives a parent of these treasured rights once a court decides that the child will be better off elsewhere. *Id.*

No. 86188-9
Madsen, C.J. (concurring in dissent)

_Madsen, C.J._

2

*In re Custody of A.F.J.*
Dissent by C. Johnson, J.


No. 86188-9


C. JOHNSON, J. (dissenting)—The majority's new rule too broadly applies the de facto parent doctrine extending it far beyond its narrow and equitable foundation. In adopting this new approach, the majority misapplies the principles this court recognized in *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005), and greatly expands the proper scope of the doctrine. In order to understand the majority's new approach, a review of the facts of *L.B.* is instructive.

In *L.B.*, we applied our traditional equitable powers to resolve a dispute not contemplated under the statutory scheme then in effect. Under the facts of that case, two women had been in a long-term, loving, and committed relationship. They dated for several months before deciding to move in together. After five years of cohabitation, they jointly decided to add a child to their relationship and signed a notarized agreement acknowledging that both women would act as the child's parents. For six years after the child was born, they held themselves out as a

family and each was involved in every aspect of raising the child, including discipline, schooling, and medical decisions. Using our powers in equity, we recognized that it was fair and just to enforce the agreement made between the biological mother and her domestic partner. *L.B.*, 155 Wn.2d 679.

Equity does not, however, support such a result under the facts here. Throughout their entire relationship—both before and after A.F.J.'s birth—Mary Franklin and Jackie Johnston were never in a long-term, loving, and committed relationship. Rather, the relationship was on-again, off-again and complicated due to drug addiction. Before the pregnancy, the women did not live in the same state, much less the same residence. This relationship is not, as the majority suggests, at the outermost bounds of the de facto parentage doctrine but at the outermost boundary of what can even be considered a relationship at all. Under these facts, it seems improbable that a court could even find a committed intimate relationship for any equitable purpose, let alone a sufficient basis for infringing on the birth parent's rights.

Moreover, opposite to what occurred in *L.B.*, Franklin and Johnston never agreed to conceive and raise a child. To the extent that they agreed to coparent after the fact, it is unclear how much choice Johnston had in the matter as a pregnant, single woman struggling with drug addiction. Perhaps most probative as

to the nature of the women's relationship at the time of A.F.J.'s birth, Johnston chose to get her own apartment when she left Perinatal Treatment Services with the baby, rather than move in with Franklin. Although the two women lived together briefly in January 2006, within a matter of weeks Franklin called Child Protective Services due to Johnston's relapse. A.F.J. was allowed to return to Franklin's care only after she promised to obtain a foster parent license. At no point did any coparenting occur and, from that point forward, Franklin was A.F.J.'s foster parent while Johnston was in and out of drug rehabilitation centers. While her actions in helping to raise A.F.J. are certainly laudable, they should not confer de facto parent status to her.

As should be clear from the above discussion, the circumstances here and in *L.B.* are in no way similar. There was no continued natural progression of the relationship by entering into a purposeful agreement to conceive, followed by implementation of that agreement as coparents. No coparenting ever occurred. Johnston was vulnerable at every key point in the development of Franklin's parent-like relationship, which calls into question whether Franklin's parent-like role was ever truly fostered and consented to by the mother.

Johnston's supposed consent and fostering of Franklin's parental relationship is further disproved by the fact that the parent almost always

3

determines who cares for the child while he or she is dependent. These are often tumultuous and emotional times for the child and, in an effort to reduce the impact on the child (as well as in recognition that the parents' rights have not been terminated), the Department of Social and Health Services will generally consider the parents' wishes regarding placement as in the child's best interests. A parent who successfully implements the changes required by the dependency proceedings should expect reunification with their child rather than, as here, further deprivation of their rights by the person entrusted by the State with temporarily caring for the child.

When dependency proceedings were instituted against her, Johnston had little choice but to "consent and foster" a parental relationship with someone. Johnston was in a vulnerable position. Threatened with the possible loss of her child, she made the best of her limited choices. She chose the woman she happened to be dating at the time. Because she reached out for help, the majority upholds depriving her of rights in the care and upbringing of her son. The majority's new expansive rule is not controlled by the same narrow, equitable principles applied in *L.B.* and is troubling in its expansiveness. I dissent.

Wiggins, J.