IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In re Parentage: | No. 31703-0-III |
| J.B.R.<br>DOB: 10/4/2000, | |
| Child, | |
| NATHANIAL A. YORK<br>(De Facto Parent) | |
| Respondent, | |
| and | PUBLISHED OPINION |
| LACEY SHOWS-RE<br>(Mother) | |
| Appellant, | |
| and | |
| JAMES A. CANDLER,<br>(Father), | |
| Defendant. | |

LAWRENCE-BERREY, J. — In 2005, the Washington State Supreme Court adopted

the doctrine of de facto parentage. In essence, a nonparent petitioner may be recognized

as a legal parent if the petitioner establishes four factors. This case presents the issue of

whether de facto parentage may be extended to a stepparent of a child with *two* legal parents. We hold that the doctrine may be so extended if the stepparent petitioner establishes the relevant four factors, which include establishing that *both* legal parents consented to the stepparent being a parent to the child. We affirm the trial court's denial of Ms. Shows-Re's motion to dismiss.

## FACTS

J.B.R. was born to Lacey Shows-Re and James Candler on October 4, 2000. The parents were teenagers at the time of J.B.R.'s birth and broke off their relationship while J.B.R. was an infant. For a combination of reasons, Mr. Candler stopped trying to visit J.B.R. when she was about two years old. He had no contact with J.B.R. over the next 10 years.

Nathaniel York was just out of high school when he began dating Ms. Shows-Re in 2002. J.B.R. was about two years old. Mr. York treated J.B.R. as his child; J.B.R. referred to him as her father. Ms. Shows-Re encouraged the relationship. Ms. Shows-Re and Mr. York had a daughter, N.A.Y., while together.

Mr. York and Ms. Shows-Re ended their four-year relationship in May 2006. N.A.Y. was an infant and J.B.R. was about six years old. Mr. York's visitation of N.A.Y.

and J.B.R. was sporadic for about two years. Mr. York claims that he sought visitation with both girls but Ms. Shows-Re made it difficult.

Eventually, visitation became more regular with both children. By 2010, a regular visitation schedule was implemented with N.A.Y. Ms. Shows-Re allowed J.B.R. to accompany N.A.Y. on most of the visits. The parties dispute whether Mr. York ever had J.B.R. without N.A.Y.

After a disagreement over visitation, Mr. York filed a petition for establishment of a de facto parentage for J.B.R and a proposed parenting plan. At the time of the petition in 2012, J.B.R. was 11 years old.

The court entered a temporary parenting plan for J.B.R. About one month later, Mr. Candler responded to the de facto parenting petition and counterclaimed for visitation.

The court appointed a guardian ad litem (GAL) to investigate and make a recommendation as to whether J.B.R., then 12, would benefit from a continuing parent-child relationship with Mr. York. The GAL recommended that the court declare Mr. York de facto parent to J.B.R. and enter a split residential schedule with Ms. Shows-Re. The GAL found that J.B.R. had a close relationship with Mr. York. The GAL also found that J.B.R. considered Mr. York to be her dad and she wanted to spend as much time with

him as possible. J.B.R. believed she should have as much time with Mr. York as N.A.Y. J.B.R. liked Mr. York's house and integrated with his family.

For Mr. York, the GAL found that he did not have any financial gain in bringing the action, that he loved J.B.R. as a daughter and made no distinction between her and N.A.Y., and that he wanted an enforceable right to see J.B.R.

The GAL found that Mr. York had a 10-year relationship with J.B.R., minus the two or so years where Mr. York only sporadically saw J.B.R. and N.A.Y. Visitation appeared to be regular while Ms. Shows-Re and Mr. York were getting along and waned when they were in conflict.

The GAL noted that Mr. Candler had no contact with J.B.R. until the de facto parenting action was filed. Mr. Candler's explanation for not being a part of J.B.R.'s life was based on his troubled relationship with Ms. Shows-Re. He regretted the passive approach and wanted to be a part of her life. When asked about her relationship with Mr. Candler, J.B.R. was reluctant to commit to a prolonged relationship with Mr. Candler and, while she realized that he was her biological father, she did not see him as her "daddy." Clerk's Papers (CP) at 94. Her primary concern was getting regular visits with Mr. York. In conclusion, the GAL stated that Mr. York demonstrated a parental commitment to J.B.R. and that they had a close and bonded relationship.

Ms. Shows-Re filed a motion to dismiss the petition for de facto parentage. She contended that Mr. York could not seek the common law remedy because a potential statutory remedy was available to him and J.B.R.'s two existing parents eliminated any statutory parental right for Mr. York. The trial court denied the motion to dismiss. It found that Mr. York had been integrated into J.B.R.'s life in the role of de facto parent as defined by *In re Parentage of L.B.*, 155 Wn.2d 679, 122 P.3d 161 (2005). The court also found that J.B.R. did not have two existing, fit parents in her life at the time that Mr. York was introduced into J.B.R.'s life. The court compared the evidence to the requirements for de facto parentage and concluded that Mr. York made a prima facie showing of de facto parentage to defeat Ms. Shows-Re's motion. Ms. Shows-Re appealed the interlocutory decision to this court. This panel has agreed to decide this case rather than remand the interlocutory decision, because this case presents a controlling question of law as to which there is substantial ground for difference of opinion, the resolution of which will materially advance the ultimate termination of the litigation. RAP 2.3(b)(4).

## ANALYSIS

Whether a stepparent may acquire de facto parent status when a child has two parents is a question of law reviewed de novo. *See In re Parentage of M.F.*, 168 Wn.2d 528, 531, 228 P.3d 1270 (2010).

*De Facto Parent Overview.* In 2005, Washington adopted the doctrine of de facto parentage. "[A] *de facto* parent stands in legal parity with an otherwise legal parent" and is "'limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life.'" *L.B.*, 155 Wn.2d at 708 (quoting *C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146, 1152. A person petitioning for de facto parentage must show that (1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature. *Id.* "Once a petitioner has made the threshold showing that the natural or legal parent consented to and fostered the parent-like relationship, the State is no longer 'interfering on behalf of a third party in an insular family unit but is enforcing the rights and obligations of parenthood that attach to de facto parents.'" *In re Custody of B.M.H.*, 179 Wn.2d 224, 241, 315 P.3d 470 (2013) (quoting *L.B.*, 155 Wn.2d at 712).

*Summary of Leading De Facto Parent Cases.* In *L.B.*, Page Britain and Sue Ellen Carvin had a same-sex partnership. *L.B.*, 155 Wn.2d at 683. After five years, they chose

6

to have a child through artificial insemination of Ms. Britain. *Id.* at 683-84. The couple raised the child, L.B., for six years, during which time they held themselves out to the public as a family. *Id.* at 684. Soon after their relationship ended, Ms. Britain took measures to limit Ms. Carvin's access to L.B. *Id.* at 684-85. In November 2002, Ms. Carvin filed a petition, which included a request to be declared a de facto parent. *Id.* at 685. A family court commissioner dismissed the petition and, on revision, the trial judge affirmed. *Id.* Our Supreme Court reversed. In reversing, the court adopted the above four-part test, and emphasized that Washington courts must adopt and reform the common law to "address *gaps* in *existing* statutory enactments, providing that the common law may serve to 'fill interstices that legislative enactments do not cover.'" *Id.* at 689 (quoting *Dep't of Soc. & Health Servs. v. State Pers. Bd.*, 61 Wn. App. 778, 783-84, 812 P.2d 500 (1991)). "Washington courts have consistently invoked their equity powers and common law responsibility to respond to the needs of children and families in the face of changing realities." *Id.* Because Ms. Carvin lacked an adequate remedy at law, and because Ms. Carvin met the four-part test, the court determined that Ms. Carvin had standing to request de facto parent status. Subsequent to this decision, the legislature enacted RCW 26.26.116, which filled the statutory gap noted in *L.B.*

7

*M.F.* addressed the question of whether a stepparent could become a de facto parent when there were two fit legal parents. There, M.F. was born to Patricia Reimen and Edward Frazier in 1993. *M.F.*, 168 Wn.2d at 529. The couple separated soon afterwards, and divorced in 1995. *Id.* Their parenting plan granted primary residential placement to Ms. Reimen, and granted Mr. Frazier alternating weekends and some holidays. *Id.* at 529-30. Mr. Frazier regularly met his child support obligations and apparently exercised some visitation. *Id.* at 530. There never was an allegation that either Ms. Reimen or Mr. Frazier were unfit parents. *Id.* Soon after the couple's separation, when M.F. was about 14 months old, Ms. Reimen began dating John Corbin. *Id.* They married in 1995 and had two sons. *Id.* The couple separated in 2000 and divorced in 2002. *Id.* Mr. Corbin was granted visitation of his two sons about 45 percent of the time. *Id.* Although the parenting plan was silent as to M.F., she usually accompanied her brothers during visitations with their father. *Id.* In denying de facto parent status, our Supreme Court first emphasized that M.F. had *two* existing parents with established rights and duties. *Id.* at 532. The court secondly emphasized that Mr. Corbin had an intertwined legislative/judicial remedy, which allowed him to petition for custody (not de facto parentage), by demonstrating that placement with a fit parent would result in actual detriment to the child. *Id.* at 533. Thus, after *M.F.*, the remedy of stepparent

custody, although different and lesser than parental rights, was viewed as adequate, at least in the context where there were two fit parents.

In November 2013, our high court issued two opinions that undercut the second basis of *M.F.*'s holding. In the first opinion, *In re Custody of A.F.J.*, 179 Wn.2d 179, 314 P.3d 373 (2013), the court held that a foster parent who qualified under the four-part *L.B.* test could be granted de facto parent status, notwithstanding the availability of a nonparental custody action. *Id.* at 190. The court reasoned that custodial status markedly differed from parental status because custodial status conferred only a temporary and uncertain right; if and when the biological parent became fit, the nonparent would have no right to continue a relationship with the child. *Id.* at 186 (quoting *In re Parentage of J.A.B.*, 146 Wn. App. 417, 426, 191 P.3d 71 (2008)). In the second opinion, *B.M.H.*, the court held that a former stepparent could be a de facto parent notwithstanding the availability of a nonparental custody action. *B.M.H.*, 179 Wn.2d at 244. In that case, the former stepparent had entered B.M.H.'s life at birth, following the death of B.M.H's biological father, and had undertaken an unequivocal and permanent parental role with the consent of all existing parents. *Id.* at 243-44. In distinguishing *B.M.H.* from *M.F.*, the court noted that M.F.'s parents "shared parenting rights and responsibilities under a parenting plan . . . and that applying the equitable remedy [of de facto parentage] would

9

'infringe[ ] upon the rights and the duties of M.F.'s existing parents.'" *Id.* at 243 (some alteration in original) (quoting *M.F.*, 168 Wn.2d at 532). The court stated: "[I]t is 'inevitabl[e] [that] in the field of familial relations, factual scenarios arise, which even after a strict statutory analysis . . . leav[e] deserving parties without any appropriate remedy, often where demonstrated public policy is in favor of redress.'" *Id.* at 242 (some alteration in original) (quoting *L.B.*, 155 Wn.2d at 687). Continuing, the court stated: "Where the legislature remains silent with respect to determinations of parentage because it cannot anticipate every way that a parent-child relationship forms, we will continue to invoke our common law responsibility to 'respond to the needs of children and families in the face of changing realities.'" *Id.* at 242-43 (quoting *L.B.*, 155 Wn.2d at 689). The court clarified that *M.F.* did not preclude all stepparents from pursuing de facto parent status, and "there is no single formula for all stepparents." *Id.* at 243. The court summarily dismissed the "available remedy" argument by stating: "Precluding *any* individual from petitioning for de facto parentage because he or she can file for nonparental custody would obliterate the de facto parentage doctrine because *any* person not recognized as a parent may seek nonparental custody." *Id.* at 244.

*Application of Law to Facts.* Ms. Shows-Re challenges Mr. York's standing to petition for de facto parentage. First, she contends that the petition is available only for

persons who have no other statutory remedy to recognize their parental role and that Mr. York does not meet this threshold because he has a remedy under the nonparental custody statute, chapter 26.10 RCW.

Ms. Shows-Re's first contention fails. As recently decided by the Washington Supreme Court, the existence of a statutory gap in remedy is not an element to be established to maintain a de facto parentage action. *A.F.J.*, 179 Wn.2d at 185. While "whether a statutory gap exists is relevant to whether the court is prompted to apply an equitable remedy or whether the parties are limited to statutory avenues," it is not an element of de facto parentage to be proved. *Id.* Furthermore, no *adequate* statutory remedy is available for a person seeking parentage, such as Mr. York. *Id.* at 186. The permanent parental remedy provided pursuant to a de facto parentage action is not the same remedy as the temporary and uncertain right to custody gained from a nonparental custody petition. *Id.* (quoting *J.A.B.*, 146 Wn. App. at 426).

Second, citing *M.F.*, Ms. Shows-Re contends that de facto parentage is only available when a child does not have two legal parents whose roles are already established under our statutory scheme. She contends that because J.B.R. has two biological parents, Mr. York and the court cannot carve out a space for a third parent without eroding the rights of the other two.

11

Ms. Shows-Re's second contention also fails. The fact that J.B.R. has two living biological parents does not prohibit Mr. York from petitioning for de facto parentage. In *L.B.*, L.B. had two living, biological parents at the time of the petition. *L.B.*, 155 Wn.2d at 684-85. Nevertheless, the Washington Supreme Court adopted the de facto parentage doctrine to recognize the parental role undertaken by Ms. Carvin early in L.B.'s life. *Id.* at 707-08. The long-absent biological father's emergence into L.B.'s life at the time of the petition did not prohibit application of the doctrine.

Having disposed of Ms. Shows-Re's two central arguments, we now examine whether Mr. York has set forth a prima facie case that meets the four-part *L.B.* test:

> "(1) the natural or legal parent consented to and fostered the parent-like relationship, (2) the petitioner and the child lived together in the same household, (3) the petitioner assumed obligations of parenthood without expectation of financial compensation, and (4) the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent, relationship, parental in nature."

*L.B.*, 155 Wn.2d at 708 (quoting *In re Parentage of L.B.*, 121 Wn. App. 460, 487, 89 P.3d 271 (2004), *aff'd in part, rev'd in part by* 155 Wn.2d 679).

Mr. York clearly has set forth a prima facie case for the latter three parts. The only part that warrants discussion is the first. Mr. York entered J.B.R.'s life while she was young and filled the role left vacant by her absent biological father. The biological father's decision not to support J.B.R. and not to seek a relationship with his daughter for

12

more than a decade clearly evidences his consent for Mr. York to establish a parent-child relationship with J.B.R. The biological father's noninvolvement in J.B.R.'s life for more than a decade even fostered this relationship, as J.B.R. did not have an alternative person acting as a father figure. It is uncontested that J.B.R.'s mother consented to and fostered a parent-child relationship between Mr. York and J.B.R. If Mr. York "undertook an unequivocal and committed parental role with the consent of all existing parents but does not have a statutorily protected relationship, justice prompts us to apply the de facto parent test. This adequately balances the rights of biological parents, children, and other parties." *B.M.H.*, 179 Wn.2d at 244. We distinguish *M.F.* and follow *L.B.* based principally upon the distinction that here, the noncustodial biological parent voluntarily absented himself from his child's life, thus consenting to and fostering a relationship between his biological child and the petitioning party.

*Attorney Fees.* Ms. Shows-Re requests an award of attorney fees pursuant to RCW 26.09.140. That statute permits an award of attorney fees to a party in a dissolution proceeding. However, this proceeding is one at common law. Ms. Shows-Re's request for an award of attorney fees is therefore denied.

13

No. 31703-0-III
*In re Parentage of J.B.R.*

CONCLUSION

We affirm the trial court's denial of Ms. Shows-Re's motion to dismiss. Under appropriate circumstances, a former stepparent may petition for de facto parentage of a child. Here, the biological father's voluntary long-term absence from his child's life evidences his consent to and fostering of petitioner's parent-like relationship with J.B.R. This case is thus similar to *L.B.*, and distinguishable from *M.F.*

Lawrence-Berrey, J.

WE CONCUR:

Brown, A.C.J.

Fearing, J.

14